IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 5:25CR173 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| DEMAR DAWSON, | ) | RESPONSE TO MOTION FOR <u>*DAUBERT*</u> |
| | ) | <u>HEARING</u> |
| Defendant. | ) | |
| | ) | |
| | ) | |

Now comes the United States of America, by and through counsel, David M. Toepfer, United States Attorney, and Peter E. Daly, Assistant United States Attorney, and hereby files its response to Defendant's motion for a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and his request to exclude evidence and testimony regarding Apple Health data collected by Defendant's cellular phone. (*See* ECF # 26: Motion, PageID 100-06; ECF # 31: Supplement, PageID 135-37).

**I.     FACTUAL AND PROCEDURAL HISTORY**

**A.  Fire on Corwin Avenue on August 15, 2024.**

On August 15, 2024, an Akron Fire Department (AFD) ambulance and engine were traveling on Route 8 when they noticed smoke rising from a residential area next to the highway. The AFD personnel exited Route 8 and located the fire at a residence on Corwin Avenue, Akron. The property was a single-family rental house. The resident and her juvenile daughter were

inside at the time but were unaware of the fire until AFD alerted them and removed them from the house. The AFD engine located the fire on the back deck of the house and extinguished it. Firefighters observed the odor of gasoline in the area of the fire. The fire caused damage to the deck and the rear wall of the house.

     ATF SA/CFI (Certified Fire Investigator) Clay McCausland responded to the scene a short time after the fire was extinguished and began his investigation, along with an investigator from the Ohio State Fire Marshal's Office. Ultimately, the fire was determined to have been intentionally set. An ignitable liquid detecting K9 gave a positive alert on the deck. Lab testing of wood samples cut from the deck confirmed the presence of gasoline.

     Defendant lived in the rental home across the street from the fire location. Both houses are located at the end of a dead-end street. A fence ran along the end of the street and the property lines of both houses. Over the fence was a wooded area which bordered Ohio Route 8. Defendant had been served an eviction notice the morning of the fire and stated to investigators that the locks had been changed to prevent him from accessing the house.

     Video from local businesses and a gas station a short distance from the scene showed that approximately twenty-five minutes before AFD located the fire, Defendant drove from his residence to the gas station and filled a portable gas tank with gasoline. Approximately eight minutes later, video showed that Defendant returned to his residence and pulled to the back of the driveway. Approximately six minutes later, video showed a person (not identifiable, but wearing clothing similar to Defendant's) walk from Defendant's driveway toward the street and then go behind the guardrail at the dead-end, walking toward the fire location. Approximately three minutes after the person disappeared behind the guardrail, the video showed smoke coming from the fire location. One minute later, the person reappeared behind the guardrail at the dead-

end and walked back down Defendant's driveway, out of view. Five minutes later, AFD arrived on the scene.

As part of his investigation, SA/CFI McCausland noted that there was a cut opening in the fence in the backyard of the fire location, which would allow a person to enter the yard from the wooded area. This would have allowed access to the yard by the person who walked behind the guardrail at the end of the street.

Review of the data from Defendant's cellular phone showed that Defendant and the adult female resident of the fire location were engaged in a romantic relationship, but that the resident was also in another relationship at the same time. Messages indicated that in the months leading up to the fire, the female appeared to be less interested in continuing their relationship than Defendant was.

Defendant's phone data also showed Apple Health app data which corresponded to the movements of the subject on the video in the moments before the fire. Specifically, Defendant's phone showed step counts, distance traveled, and periods of activity that matched the movements of the video subject. The data also corresponded with Defendant's known movements at other times on the morning of the fire (e.g., traveling to and walking around at the gas station; moving around during the AFD activity). SA/CFI McCausland conducted a detailed analysis of those known movements and compared them to the health data at various intervals, finding that they corresponded almost exactly.

During an interview with investigators, Defendant denied any involvement in the fire. He claimed that he bought the gasoline just prior to the fire so he could mow the grass one last time before leaving his house after he was evicted. Defendant further stated that just prior to

noticing the fire department and EMS on Corwin Avenue, he had been in his upstairs bedroom after returning home from the gas station.

B. **Relevant Procedural History**

On April 16, 2025, a grand jury for the United States District Court for the Northern District of Ohio returned a one-count indictment charging Defendant with arson, in violation of 18 U.S.C. § 844(i). Defendant was arrested on April 24, 2025, and arraigned before Magistrate Judge Amanda M. Knapp on the same day. (ECF N/A: Minutes of Proceedings, 04/24/2025).

Defendant filed the instant Motion for Daubert Hearing on November 7, 2025, seeking to exclude evidence and expert testimony regarding the Apple Health data extracted from his cellular phone. (ECF # 26: Motion, PageID 100-06). The United States requested and, without objection from Defendant, was granted an opportunity to consult with an independent expert. (ECF # N/A: Minutes of Proceedings, 11/13/2025). The United States provided the expert report of Jessica Hyde, founder/owner of Hexordia, a digital forensics company, to Defendant on January 7, 2026. On February 5, 2026, Defendant filed a Supplement to his motion. (ECF # 31: Supplement, PageID 135-37).

C. **Review and Report of Special Agent/Certified Fire Investigator Clay McCausland**

On October 29, 2024, as part of his investigation into the Corwin Avenue fire, SA/CFI McCausland obtained a search warrant to examine the contents of Defendant's Apple iPhone 14. Pursuant to the warrant, an exact copy of the data from the cellular phone was extracted from the phone for review. During SA/CFI McCausland's examination of the data, he observed, in additional to other information, text messages of a personal and intimate nature between Defendant and the adult female resident of the home where the fire occurred, and messages

4

between Defendant and the property manager of his residence which indicated that Defendant was being evicted on the morning of the fire.

SA/CFI McCausland also reviewed Apple Health data extracted from Defendant's phone, both through the forensic reader software and through the original data from the phone itself. Specifically, SA/CFI McCausland reviewed data which included step counts, active energy, walking/running distance, and walking speed. SA/FCI McCausland compared such data with the surveillance videos from the time of the fire that he had obtained from local businesses and found that the Apple Health data corresponded with the movements of the person seen in the videos moving from Defendant's residence towards the fire location and then returning to Defendant's residence at the time of the fire. SA/CFI McCausland further observed that the Apple Health data from Defendant's phone corresponded with Defendant's known movements before the fire while he was at the Circle K gas station and after the fire while he was on the scene at Corwin Avenue, all of which was captured on surveillance videos. SA/CFI McCausland documented his observations in a report of investigation.

**D. Review and Report of Digital Forensics Examiner Jessica Hyde**

At the request of the government, digital forensics examiner Jessica Hyde conducted an independent review of the data extracted from Defendant's Apple iPhone 14. Specifically, Ms. Hyde was provided with a full file system forensic image of Defendant's Apple iPhone. She used several digital forensic processing tools, including Magnet AXIOM, Cellebrite Inseyets Physical Analyzer, iLEAPP, ArtEx, and HEART (Health Events & Activity Reporting Tool), to examine and analyze the data.

During her review, Ms. Hyde observed that between 8:15am EDT and 9:00am EDT on August 15, 2024, the timeframe of the fire at Corwin Avenue, Defendant's phone recorded

specific data showing phone calls, text messages, and health data. The health data, which Ms. Hyde parsed from the healthdb_secure.sqlite database on the phone, showed numerous health events recorded by Defendant's phone at specific time intervals during the relevant timeframe, including steps taken, walking/running distance, walking speed, and flights climbed. The data observed and documented by Ms. Hyde was consistent with that observed and documented by SA/CFI McCausland, though Ms. Hyde was able to parse data additional to that observed by SA/CFI McCausland. Ms. Hyde documented her methods and observations in an expert report.[1]

As part of her expert report, Ms. Hyde described the evidence that she analyzed, the methods and tools she used in her forensic analysis, and her relevant findings. (Exhibit 1: Hyde Report, pp. 1-4). The report also stated Ms. Hyde's conclusion: "There is relevant mobile forensics data including health data that shows a significant amount of activity between 8:18am and 8:56am EDT on August 15, 2024. Additionally there are 4 outgoing calls, 1 received SMS, and one sent SMS between 8:15am and 8:58am EDT on the same date." (*Id*. at p. 6).

Ms. Hyde's report included a summary of several peer-reviewed papers regarding Apple Health data from the healthdb_secure.sqlite database. (*Id*. at p. 5). That summary included information from peer-reviewed studies on the accuracy of Apple Health data as recorded by various iPhone models. (*Id*.). One primary study (Zandwijk & Boztas) examined the accuracy of step and distance data recorded by iPhones in order to determine the reliability of such data as digital evidence. Ms. Hyde explained in her summary that the study concluded that "Health App software does an efficient job in determining number of steps," while there was some variability in distance measured under certain conditions. (*Id*., quoting Zandwijk & Botas, "The iPhone

---

[1] Jessica Hyde's expert report is attached as Exhibit A to Defendant's Supplement (ECF # 31-1, PageID 138-43). The report is also attached as Exhibit 1 to this Response.

Health App from a forensic perspective: can steps and distances registered during walking and running be used as digital evidence?"). Ms. Hyde's summary also included the findings from studies regarding the Apple Health app's method of calculating flights climbed, both of which found that an increase in elevation of three meters registers as a flight climbed. (*Id*.). Finally, the report included a list of references to articles and studies regarding Apple Health data, its accuracy, and its use as an investigative tool. (*Id*. at p. 6). For each reference, Ms. Hyde included a link to the item so that the reader could view the original material. (*Id*.).

## II. LAW AND ARGUMENT

### A. The *Daubert* Standard

Defendant moves pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), for a hearing to determine the admissibility of the Apple Health data extracted from Defendant's cellular phone which provided evidence of Defendant's movements at and around the time of the arson with which he is charged in this case. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed.R.Evid. 702.

As the Supreme Court noted in *Daubert*, the federal rules have a "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588-89. Nevertheless, the district court serves an important "gatekeeping role" and "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id*. at 589, 597. The proponent of such testimony bears the burden of proving its admissibility by a preponderance of proof. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

Testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. "An additional consideration under Rule 702 – and another aspect of relevancy – is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute[.]" *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)).

To assist trial courts in determining the reliability of proposed expert testimony, the *Daubert* Court set forth several factors that courts may consider, including:

(1) whether the theory or technique has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and

(4) whether the theory or method has been generally accepted by the scientific community.

*Daubert*, 509 U.S. at 592-94.  The Supreme Court has emphasized that these factors are "not a definitive checklist or test," and that the Rule 702 inquiry is "a flexible one."  *Daubert*, 509 U.S. at 592-95.  "Indeed, [the *Daubert*] factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).

    **B.**  **Digital Forensics Examiner Hyde's Testimony is Relevant**

Applying the principles of *Daubert* to the instant case, it is clear that the testimony of Jessica Hyde regarding the Apple Health data captured by Defendant's iPhone is relevant.  Indeed, Defendant makes no challenge to the relevancy of the evidence.  Nor could he.  Such data, and Ms. Hyde's testimony about it, relates to Defendant's movements around the time of the arson at issue in this case.  Alongside other evidence, including surveillance video footage and Defendant's statements, the Apple Health data found in Defendant's phone "will aid the jury in resolving a factual dispute" – namely, the identity of the person who committed the arson on Corwin Avenue on August 15, 2024.  Thus, the evidence is clearly relevant for purposes of the *Daubert* inquiry.

    **C.**  **Digital Forensics Examiner Hyde's Testimony is Reliable**

 Likewise, Ms. Hyde's testimony satisfies the reliability requirements of Rule 702 as set forth in *Daubert*.  That prong of the analysis must focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95.  In the instant case, application of the *Daubert* factors shows that the methods used by Ms. Hyde to analyze the data collected by Defendant's iPhone and the principles underlying her analysis are reliable and, thus, her testimony about those methods and principles is admissible.

 The primary focus of Defendant's *Daubert* challenge is on the accuracy and reliability of the data collected by the Apple Health app and stored in the healthdb_secure.sqlite database.

9

(ECF # 26: Motion, PageID 104-06).  But the use of such data to draw conclusions about a user's actual movements satisfies all of the *Daubert* factors for reliability, rendering such evidence admissible under Rule 702.

First, the accuracy of the data has been tested and such testing has been subjected to peer review.  Moreover, that peer-reviewed testing includes findings about the "potential rate of error" in the data.  As Ms. Hyde noted in her report, in a 2019 peer-reviewed study by Jan Peter van Zandwijk and Abdul Boztas, ("The iPhone Health App from a forensic perspective: can steps and distances registered during walking and running be used as digital evidence?")[2] the authors conducted testing to "investigate the accuracy of steps and distances registered by the Health App under a broad range of experimental conditions," for the purpose of determining the usefulness of such data in forensic investigations.  (van Zandwijk and Botas, 2019).  That study concluded that "[s]teps registered by the iPhone Health App agree very closely to those measured manually with an averaged error of about 2%." (*Id*.).  The authors further noted, "The reliability of the registered distances, however, depends on a number of factors, including walking speed and walking style of the subject and can deviate up to 30–40% from the true value." (*Id*.).  Even with such potential deviations between registered distances and actual distance traveled, the authors noted that the registered distance data could still have evidentiary value in determining the probability of "different routes and scenarios." (*Id*.).  Specifically, they stated, "Without prior knowledge of walking speed and carrying location, the likelihood of the digital traces might be the same if the lengths of the two routes under consideration are not too different. On the other hand, when the two distances differ considerably in length, meaningful

---

[2] https://doi.org/10.1016/j.diin.2019.01.021

10

probability statements can be formulated." (*Id*.). Thus, in a case such as the one before the Court, in which two possible scenarios for the user's activity at a particular time differ greatly, the distance registered by the Health app can be useful in determining the user's true activity.

Other similar testing has shown similar results. In a 2025 study posted on the digital forensics website DoubleBlak and cited Ms. Hyde's report, digital forensics examiner Ian Whiffin described his accuracy testing of data collected by the Apple Health app on iPhones. ("Apple Health Accuracy & Reliability," Whiffin, 2025).[3] Like that of van Zandwijk and Boztas, Whiffin's testing showed that data collected in the healthdb_secure.sqlite database "gave a step count which was remarkably close to the actual number of steps taken," but that "[t]he recorded distance travelled by each of the devices was typically under-reported." (*Id*.).

Finally, both the methods of testing described in the applicable studies and Ms. Hyde's methods of examining the data in this case have been widely used in the field of digital forensics. First, each of the cited studies involving the accuracy of Health app data tested that data by comparing the measurements captured by an iPhone (steps, distance, flights climbed) over a known interval of time with actual measurements of steps, distance, and flights climbed during that same testing interval. Using those comparisons, each study's author was able to draw conclusions about the accuracy of the Health app data and the various factors that influence such accuracy. Based upon its repeated use in multiple studies, the Court can reasonably conclude that this method of testing has been accepted in the field of digital forensics.

Second, the data Ms. Hyde used to reach her conclusions came from the healthdb_secure.sqlite database in Defendant's phone. (Ex. 1: Hyde Report, p. 3). This database

---

[3] https://www.doubleblak.com/blogPost.php?k=healthaccuracy

11

is the one used in virtually all testing involving Apple Health data, including the studies cited in Ms. Hyde's report, because it is the primary database on Apple devices that stores the most detailed and most sensitive user health and fitness data.  Thus, Ms. Hyde's use of this database to reach her conclusions about the data collected by Defendant's phone is consistent with accepted practice in the field of digital forensics.

In the supplement to his motion, Defendant alleges that Ms. Hyde's report fails to provide information as to "how [Apple Health] data is collected," and "what this data means."  (ECF # 31: Supplement, PageID 136).  But this argument misunderstands the requirements of Rule 702 and *Daubert*.  As discussed above, a party offering expert testimony is only required to show that the testimony is relevant and reliable.  The relevance of Ms. Hyde's testimony is clear and uncontested – it relates to a central issue in the case regarding the identity of the person who committed the arson charged in the indictment.  Likewise, Ms. Hyde cited numerous sources in her report which support the reliability of the data that she analyzed in this case.  There is no requirement that Ms. Hyde conduct her own testing of the underlying data, nor that she provide an exhaustive explanation of the studies upon which she relied in forming her opinions about what the data in Defendant's phone showed.  Rather, an expert is permitted to rely upon the expertise and opinions of other experts in forming her own opinions.  *See Counts v. General Motors, LLC*, 606 F.Supp.3d 547, 587 (E.D. Mich. June 9, 2022) ("[B]asing an expert opinion on another expert's opinion reflects sound judgment. Indeed, a benchmark of any sound analysis is citing or critiquing the opinions of other expert opinions."); *United States v Roberts*, 830 F.Supp.2d 372, 387 (M.D. Tenn. Nov. 17, 2011) (finding expert competent to testify where expert's report identified the sources he relied upon, noted some problems with those sources, and stated what he took from those sources in arriving at his own opinions).

In addition, there is no requirement that Ms. Hyde explain or even have knowledge of Apple's proprietary method of collecting data through the Health app in order to demonstrate the reliability of that data.  Indeed, Ms. Hyde cites numerous studies that have shown the data to be reliable through scientifically sound testing, despite none of the studies' authors actually having access to Apple's proprietary information to know how the data is actually collected.  Thus, Defendant's argument that Ms. Hyde's testimony regarding the Apple Health data in Defendant's phone is unreliable because she does not explain "how this data is collected" is without merit.

### D. Digital Forensics Examiner Hyde is Qualified to Testify Regarding Her Analysis of Defendant's Apple Health Data

#### 1. Testimony to be Presented Regarding Apple Health data

At a hearing on November 13, 2025, the Court tasked the government with distinguishing between the testimony to be presented by SA/CFI McCausland and by Digital Forensics Examiner Hyde regarding the Apple Health data collected by Defendant's phone.  The government anticipates that Ms. Hyde will testify regarding her examination and analysis of the Apple Health data collected by Defendant's iPhone at and around the time of the arson on August 15, 2024, as documented in her expert report.  Her testimony would also include an explanation of what the data is, where it is stored in the phone, and other relevant information about the data that is within her area of expertise and that would assist the jury in understanding her findings.  Ms. Hyde's testimony may also include information about the reliability of the data, including citation to the studies noted in her report.

As to SA/CFI McCausland, the government anticipates that, in addition to all other aspects of his investigation in this case, he would testify regarding his review of the Apple Health data from Defendant's iPhone and his comparison of that data to other evidence in the

Case: 5:25-cr-00173-SO  Doc #: 34  Filed: 02/17/26  14 of 16.  PageID #: 169

case, including but not limited to surveillance videos and Defendant's statements, as documented in his various reports of investigation.  The government does not anticipate that SA/CFI McCausland would testify to the reliability of the data, the collection of the data by the iPhone, or any expert opinions regarding the data.  The government does reserve the right, however, to present additional testimony from SA/CFI McCausland regarding the Apple Health data if necessary to address issues or questions raised by defense counsel during cross-examination of SA/CFI McCausland or any other witness.

## 2. Digital Forensics Examiner Hyde's Qualifications as an Expert

In his original *Daubert* motion, Defendant challenged SA/CFI McCausland's qualifications to testify as an expert on the data collected by the Apple Health app on Defendant's iPhone.  (ECF # 26: Motion, PageID 104).  In the supplement to his motion, Defendant "does not concede that Ms. Hyde is qualified to serve as the government's expert in this matter." (ECF # 31: Supplement, PageID 136).  Given the government's representation that it does not anticipate eliciting expert testimony regarding Apple Health data from SA/CFI McCausland, this response will address only Ms. Hyde's qualifications to testify as an expert and to provide opinion testimony on that topic.

Ms. Hyde earned her Bachelor of Science degree in electronics engineering technology from the ECPI College of Technology, and her Master of Science degree in computer forensics from George Mason University.  Her curriculum vitae is attached hereto as Exhibit 2.

Ms. Hyde is the owner and founder of Hexordia, a company founded in 2021 that conducts digital forensics and offensive security services, training, and research, with a focus on mobile forensics.  Since 2016, she has also served as an adjunct professor at George Mason University, where she teaches a graduate-level course in mobile device forensics.  Prior to founding Hexordia, Ms. Hyde was the Director of Forensics at Magnet Forensics, where she

14

helped develop digital forensics tools and methods for extracting data from a variety of digital devices; provided technical assistance to customers across private, government, and law enforcement sectors; and was a recognized expert in digital forensic analysis.  Ms. Hyde's experience also includes additional work in digital forensics in the private sector and as an avionics electrician in the United States Marine Corps.

Ms. Hyde has achieved a number of certifications and licenses in the field of digital forensics, including as a NW3C Certified Cyber Crime Examiner and as a GIAC Certified Forensic Examiner.  She has also earned numerous awards and commendations for her work in digital forensics, and published writings and delivered presentations on various topics in that field.

Ms. Hyde has previously testified four times as an expert in digital forensics analysis.

Given her education in electronics engineering and computer forensics, her extensive experience working in the field of digital forensics, her prior expert testimony, and the other qualifications listed above and in her curriculum vitae, Ms. Hyde is clearly "qualified as an expert by knowledge, skill, experience, training, or education," as required under Rule 702, such that she can provide opinion testimony regarding her work in this case.

### III. CONCLUSION

Based upon the foregoing, the United States respectfully requests that this Court deny Defendant's motion to exclude expert testimony pursuant to Rule 702 and *Daubert*.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

/s/ Peter E. Daly
Peter E. Daly  (OH: 0084745)
Assistant United States Attorney
Federal Building
2 South Main Street, Room 208
Akron, OH 445308
(330) 761-0529
Peter.Daly@usdoj.gov
