COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CRIMINAL ACTION
NO. 1684CR00824

COMMONWEALTH

vs.

VICTOR ARRINGTON

## FINDINGS OF FACT, RULINGS OF LAW, AND ORDER ON THE COMMONWEALTH'S MOTION FOR RECONSIDERATION OF ORDER EXCLUDING EXPERT TESTIMONY REGARDING FREQUENT LOCATION HISTORY DATA

On November 1, 2016, a Suffolk County grand jury indicted Defendant, Victor Arrington

("Defendant" or "Arrington"), on charges of murder, home invasion, kidnapping, arson of a

dwelling, armed assault with intent to murder, and possession of a firearm without a license in

connection with events on March 31, 2015, which resulted in the death of Richard Long. The

Supreme Judicial Court (SJC) previously summarized the allegations underlying the indictment

as follows:

> The Commonwealth alleges that at around 10:51 A.M. on March 31, 2015, the defendant, a cooperating witness, and Jeromie Johnson participated in a home invasion on Harvard Street in the Dorchester section of Boston. Richard Long, Yvette O'Brien, and O'Brien's newborn son were at home at the time of the attack. Johnson and the defendant bound Long and O'Brien with electrical cords, cut Long with a knife, and shot both Long and O'Brien in the head. They then set fire to the house. Long died from his wounds. O'Brien survived the gunshot wound and can describe the events that occurred in the apartment until she was shot in the head, but she is unable to identify the perpetrators. The cooperating witness agreed to testify against [Arrington] in exchange for facing reduced charges.
>
> . . . [Arrington] allegedly drove to the crime scene in a white sedan rented by his girlfriend for his use. The [ ] car was captured on video being driven down Blue Hill Avenue in Dorchester, with another car carrying Johnson and the cooperating witness following behind. [Arrington's] car was next seen parked on Paxton Street near the scene

1

GOVERNMENT
EXHIBIT

7

5:25CR173

of the crime. At 10:44 A.M., [Arrington] received a call from Johnson lasting over three minutes, and the defendant called Johnson several times over the next few minutes with no answer. [Arrington's] telephone utilized a cell tower the coverage area of which included the crime scene for these calls.[] A video camera at a Department of Youth Services facility located across the street from the crime scene captured grainy video footage of two people approaching the victims' home at 10:51 A.M., and the same video camera captured footage of three people leaving at 11:20 A.M. [Arrington's] car was captured on video at 11:22 A.M. being driven down Blue Hill Avenue.

Commonwealth v. Arrington, 493 Mass. 478, 480-481 (2024) (internal footnote omitted).

Eight days later, on April 8, 2015, Arrington and Johnson were victims of a shooting. Johnson did not survive. Arrington was treated at Brigham & Women's Hospital. A Boston Police detective responded, and hospital staff provided him with certain of Arrington's effects including an Apple iPhone 6.[1] That iPhone received the call from Johnson on March 31, 2015, and is the subject of the present motion. Id. at 481 n.7; Commonwealth v. Arrington, No. 1684CR00824, Dkt. No. 99, slip op. at 3-5 (Mass. Super. Jan. 26, 2022) (White, Jr., J.).

On July 11, 2023, the Commonwealth moved *in limine* to introduce evidence at trial of frequent location history (FLH) data retrieved from the iPhone. Following a Daubert-Lanigan hearing, the Court (Doolin, J.) denied the motion. Arrington, No. 1684CR00824, Dkt. No. 179, slip op. (Mass. Super. Sept. 11, 2023). On February 20, 2024, the SJC affirmed the denial. See Arrington, 493 Mass. at 498-499. Defendant was tried in May 2024. After six days of deliberation and despite a Tuey-Rodriguez instruction, the jury remained deadlocked, and the Court (Doolin, J.) declared a mistrial on May 22, 2024.

Before the Court is the Commonwealth's Motion for Reconsideration of the Order Excluding Expert Testimony Regarding Frequent Location History Data. The Commonwealth contends that the FLH data places the iPhone at issue in the immediate vicinity of the crime scene during time when the crime was committed. In support of its renewed motion, the

---

[1] IMEI 35444506583 4219

2

Commonwealth has offered evidence not presented at the prior Daubert-Lanigan hearing: (1) the testimony of two digital forensics experts, Ian Whiffin ("Whiffin") and Jessica Hyde ("Hyde"); (2) an article authored by Whiffin and peer-reviewed by Hyde and others; and (3) the results of additional testing performed by the Commonwealth concerning FLH data.

As Defendant's first trial ended in hung jury, the Court's prior order denying the admission of FLH data is not binding as the "law of the case." Commonwealth v. Phim, 462 Mass. 470, 473-474 (2012).[2] Nor does the SJC's decision to affirm that prior order (upon review for abuse of discretion) preclude the Court from addressing the present motion anew. See Arrington, 493 Mass. at 498 (Lowy, J., concurring) ("[T]oday's ruling does not dictate the result at a Daubert-Lanigan hearing in another case based upon either existing or evolving [FLH] technology."); Commonwealth v. Davis, 487 Mass. 448, 458 (2021) ("[O]n retrial the Commonwealth may again attempt to lay the proper foundation for the [ ] evidence[.]"). Thus, the Court treats the Commonwealth's Motion as a motion to permit expert evidence. See Colorio v. Marx, 72 Mass. App. Ct. 382, 385 (2008) (court looks to substance of motion, not its label).

Following an evidentiary hearing, and upon consideration of the pleadings, the arguments, the evidence, and the appropriate legal standards as discussed herein, the Commonwealth's Motion shall be **ALLOWED**.

## FINDINGS OF FACT

The Court held an evidentiary hearing across six days,[3] during which the Commonwealth presented the testimony of three digital forensic[4] examiners, Hyde, Whiffin, and Chris Kindig. In

---

[2] Even where applicable, the "law of the case" doctrine is permissive, not mandatory. Salter v. Scott, 363 Mass. 396, 402 (1973).

[3] June 27, July 17, July 18, July 24, and October 24, 2025, and February 25, 2026

[4] The National Institute of Standards and Technology, an agency within United States Department of Commerce, defines digital forensics as the "application of science to identification, examination and analysis of data while preserving the integrity of the information and maintaining a strict chain of custody for the data." "In its strictest connotation, the application of computer science and investigative procedures involving the examination of digital

3

rebuttal, Defendant presented the testimony of another digital forensic examiner, Steven Verronneau. Seventy-three exhibits were also admitted into evidence. Based on the testimony, exhibits, agreed facts, other credible evidence introduced, and the reasonable inferences drawn therefrom, the Court finds the following facts:

## I. COMMONWEALTH'S WITNESSES

### A. Chris Kindig

Chris Kindig ("Kindig") has been the Director of the Suffolk County District Attorney's Office's Digital Evidence Lab (DEL) since June 2024. He began as a Senior Crime Lab Analyst with the DEL in July 2020.[5] Kindig supervises a team of digital forensic examiners who collect and analyze digital evidence, including from cell phones, computer and cloud data. He has participated in more than one hundred investigations involving digital evidence, fifty or more involving extracted cell phone data. For the past three years, Kindig has participated in the Massachusetts Cyber Crime Coalition, a task force created by the Attorney General's Office, that shares resources and training between the Suffolk, Middlesex and Northwest District Attorneys' Offices. He is certified by the International Association of Computer Investigative Specialists as a forensic computer examiner and forensic mobile device examiner, and by Global Information Assurance Certifications as an examiner of iOS and MacOS, the respective operating systems of Apple iPhones and computers. Kindig has attended numerous seminars in the field of digital forensics which covered iOS devices, including trainings by the Federal Bureau of Investigation and the National White Collar Crime Center.

---

evidence – following proper search authority, chain of custody, validation with mathematics, use of validated tools, repeatability, reporting, and possibly expert testimony." DIGITAL FORENSICS, NIST, Computer Security Resource Center, Glossary (2025), available at https://csrc.nist.gov/glossary/term/digital_forensics.

[5] Kindig previously worked at the corporate office of TJX Industries as part of the Global Investigations and Safety Team, including conducting digital forensic examinations, threat monitoring, and participating in corporate investigations.

4

The court finds the testimony of Kindig to be credible in all respects and accordingly adopts such testimony as part of its findings.  The Court, particularly credits Kindig's testimony as it relates to the data extracted from Arrington's iPhone 6, the general functioning of Apple's Location Services and Frequent Locations features, and the testing the DEL performed with regard thereto.

### B. Ian David Whiffin

Since 2020, Whiffin has been employed by Cellebrite, which specializes in designing software and other tools to extract, examine and investigate data from digital devices. Cellebrite is considered an industry leader, and its customers include law enforcement, private sector companies, and government agencies, including the National Institute of Standards and Technology (NIST) within the Department of Commerce. Whiffin has worked Cellebrite's Decoding Product Manager and Senior Digital Intelligence Expert. He examines and reverse engineers cell phone applications (apps) to ensure that Cellebrite's tools can extract communications, location information, and other data from those apps. He previously worked with Cellebrite's research and development, and product teams to ensure that Cellebrite's tools meet the needs of the company's customer base.

Whiffin previously served as a law enforcement officer for seventeen years, first with the South Yorkshire (United Kingdom) Police Department and then the Calgary (Canada) Police Service. He began working as a digital forensics examiner for the Calgary Police in 2013. There, Whiffin and other examiners were responsible for processing every piece of digital evidence obtained by the department (with the exception of child abuse cases), including extracting and examining data contained within cell phone devices.

Whiffin is trained and experienced in the operation and examination of digital devices,

5

including Apple iPhones. He operates a website in which he writes on his research and other issues in field of digital forensics. He has authored five articles concerning the location data found on iPhones and has also designed five apps for use on iPhones. Several of Whiffin's writings have been peer reviewed and published in trade publications, including an article on Apple's Locations Services and Signification Locations feature – the latter being the successor to Apple's Frequent Locations feature at issue in the present motion. Whiffin testified as a digital forensics expert on twenty-four prior occasions in courts in Canada, Australia, the United Kingdom, and the United States, including twice in Massachusetts.[6] He has never failed to qualify as an expert in the subject matter.

The Court credits Whiffin's testimony here and accordingly adopts such testimony as part of its findings.

### C. Jessica Hyde

Hyde is a certified forensics examiner. She holds bachelor's degree in electronic engineering technologies from ECPI University and master's degree in computer forensics from George Mason University. Her graduate coursework covered Apple iOS devices and the associated location features and data. After serving in the United States Marine Corps as an avionics electrician for Harrier jets, Hyde worked as a government contractor at the Terrorist Explosive Device Analytic Center ("TDAC"), reverse-engineering and performing digital forensics analysis of improvised explosive devices, many of which utilized mobile phone components. From 2014 to 2016, while employed by Basis Technology, she was contracted to work as a senior mobile exploitation analyst for the Directorate of National Intelligence's

---

[6] Because Whiffin's employment agreement with Cellebrite precludes him from accepting outside compensation, he has testified in such matters *pro bono* and does not accept remuneration for his writing on digital forensics.

6

National Media Exploitation Center (NMEC).[7] In 2016, she became the Director of Forensics at Magnet Forensics, another leading provider of digital forensics software, and oversaw testing and validation of the company's products, which included tools to extract Location Services, Frequent / Significant Locations and other data from Apple devices. In 2021, Hyde founded her own digital forensics firm, Hexordia, which performs research and development, and provides training in digital forensics.

Since 2016, Hyde has taught a graduate-level course in digital / mobile forensics at George Mason University. An entire portion of her curriculum is dedicated to Apple iOS devices, including the related location features.[8] Hyde has published seven articles in the field, including an article on iOS timestamps. In 2022, she was recognized with the SANS Institute's "Article of the Year" for an article on mobile forensics acquisition, testing and validation methodologies which she co-authored with an examiner at Cellebrite and a special agent of the FBI. Hyde is a member of the Executive Board of the Scientific Working Group on Digital Evidence and co-authored the NIST guidelines for digital evidence. She has peer-reviewed numerous published articles on digital forensics and testified as a digital forensics expert on three prior occasions, twice in Massachusetts.

The Court credits Hyde's testimony in this matter and accordingly adopts such testimony as part of its findings.

## II.      APPLE LOCATION FEATURES AND FLH DATA

IPhones run on Apple's proprietary mobile operating system (iOS). Since 2008, successive versions of iOS have included "Location Services," an app programming interface

---

[7] The NEMC was established in the wake of the 9/11 attacks to serve as a hub for analysis of digital and other media evidence collected by the federal government's national security agencies.

[8] Hyde also taught the same course material at Champlain College during the 2019-2020 academic year.

7

that estimates the iPhone's location based on assisted-GPS. Thus, in addition to satellite-based global positioning system (GPS), Location Services uses the detected proximity to the known locations cell towers, WiFi networks, and/or Bluetooth beacons to geolocate the iPhone. Apple maintains an extensive database of cell tower, WiFi and Bluetooth networks and their locations, a subset of these known networks (relevant to the iPhone's general area of use) are automatically downloaded to a user's iPhone to assist the Location Services feature. Thus, at any given time, an iPhone has hundreds or thousands of locations of identified networks stored locally on the device. When the iPhone then comes into contact with these known networks, either by connecting with the constant signal of a cell tower or detecting WiFi networks or Bluetooth beacons, the Location Services feature utilizes this information to estimate the iPhone's location. Geolocating based on a cell tower, or "cell-siting" is considered the least accurate source of assisted-GPS because cell tower signals have ranges of thousands of feet and can be disrupted by buildings and geographic obstacles. Location Services can estimate an iPhone's distance from a WiFi source or Bluetooth beacon based on the signal strength. (The reach of a WiFi is typically about 45 meters indoors and 70 meters outdoors).[9] Lastly, GPS is considered accurate to within approximately five meters, although it can be impacted by interference.[10]

The number and type of assisted-GPS sources available to the iPhone impacts the specificity with which the Location Services feature can estimate the iPhone's location. Densely populated urban areas generally have a higher concentration of cell towers, WiFi networks, and Bluetooth beacons and thus, more sources of assisted-GPS. Conversely, a rural area may provide better sight lines for GPS but fewer cell towers, WiFi networks, and Bluetooth beacons. The

---

[9] Bluetooth ranges vary based on level of technology but generally operate similar to WiFi networks for the purpose of assisted-GPS.

[10] GPS is the only one of the four sources that can provide a three-dimensional estimate of a device's location, providing altitude in addition to latitude and longitude.

8

longer an iPhone spends in an area, the more assisted-GPS sources it is likely to contact and thus, the more information that the iPhone is able to gather to estimate its location.

When Location Services are enabled, the feature automatically estimates the iPhone's location, based on available assisted-GPS sources, every ten to fifteen minutes. This allows Apple to gather and aggregate data across iPhones to, *inter alia*, generate real-time traffic information. IPhone apps also utilize Location Services to varying degrees and may increase the frequency with which the feature estimates the iPhone's location. For instance, some apps may only need to know the city / town where the iPhone is located to facilitate its purpose. Whereas the Camera app and navigation apps (e.g., Google Maps, Apple Maps), may cause Location Services to constantly estimate the iPhone's location.

Location Services records and locally stores data points for the detected sources of assisted-GPS for up to 72 hours. Each record consists of center point coordinates (longitude and latitude), a radius (in meters), and a timestamp. These Location Services data points can be mapped as circles of various sizes, reflecting the number and variety of assisted-GPS sources Location Services relied upon at a given time. The sizes of the radii are correlated with the accuracy of the sources of assisted-GPS: a cell tower may have a radius of several thousand meters, WiFi 50 to 70 meters, and GPS typically less than ten meters.

In 2013, Apple introduced the "Frequent Locations" feature with release of iOS 7. This feature uses a proprietary Apple algorithm to identify patterns from the Location Services data points, specifically locations where the iPhone has visited more than once.[11] Apple designed the Frequent Locations feature (now known as "Significant Locations")[12] to allow Apple to provide

---

[11] The Commonwealth has not introduced any evidence of the algorithm's coding or how the Frequent / Significant Locations feature weighs Location Services data points to generate FLH data.

[12] With the introduction of iOS10 in 2016, Apple renamed the Frequent Locations function as "Significant Locations." Per Whiffin and Hyde, Significant Locations functions in essentially the same manner as Frequent

9

users with useful information about locations the user visits often. For example, if the user routinely travels to and stays at the same location for approximately eight hours per day, the Frequent Locations feature is designed to identify the location as the user's worksite and then prompt the user with information, such an estimated commute times, nearby coffee shops, etc.

An iPhone runs the Frequent Locations process every few days – before the Location Services data points are discarded – and generates frequent location history (FLH) data for each Frequent Location. Similar to the underlying Location Services data points, an FLH record includes longitude and latitude coordinates of the center point and an "uncertainty" radius in meters. The FLH data also records timestamps for the estimated entry and exit times of the visit and a record of the number of visits made to the Frequent Location.[13] Unlike Location Services data points, FLH data is not automatically erased or discarded.

To be identified as a Frequent Location the algorithm must identify at least two visits to the location. Once identified as a Frequent Location, additional visits to the area may cause the Frequent Locations feature to revise the recorded center point coordinates and uncertainty radius as the iPhone gathers more data points regarding the user's routines and movements.

The entry and exit timestamps recorded in the FHL data do not necessarily reflect the exact times the iPhone entered and left the uncertainty radius. Rather, the entry timestamp reflects the earliest Location Services data point which the Frequent Location feature relied upon to generate the FLH record. As a result, the entry timestamp is typically at or minutes after the iPhone has actually arrived in or near the uncertainty circle. The exit timestamp may be less

---

Locations, and the underlying process which an iPhone uses to identify its location and derive FLH data were unchanged. The database where FLH data is locally stored on an iPhone changed with the advent of Significant Locations and iOS10.

[13] Each FLH record also records a "Confidence" value between zero and one, but the Commonwealth does not rely upon or seek to introduce this evidence.

10

precise because it reflects the last Location Services data point associated with the Frequent Location or the first recognized Location Services data point outside the vicinity of the Frequent Location.

In his peer-reviewed and published article, "Locations, Locations, Locations,"[14] Whiffin detailed the functioning of Apple's Location Services and Significant Locations (the successor to Frequent Locations), as well as testing he performed using an iPhone 6 running iOS 12.4.1. This consisted of driving with the test iPhone in the Calgary area for several days between June 16 and 22, 2020, including from his home to his office and back, and on three to four-hour drives around the city. Whiffin determined that of the more than 7,000 Location Services data points generated during the testing, the true location of the test iPhone was within the recorded radius for 98% of the data points. For 1.8% of data points, the true location of the device was outside but within 20 to 30 meters of the radius. For the remaining 0.2%, the data point reflected a location where the iPhone had been approximately 10 to 20 minutes earlier.

With regard to the Significant Locations feature, Whiffin noted that once the iPhone identified a Significant Location, it could record a subsequent visit to the location even when the iPhone was outside the uncertainty radius. For instance, his test iPhone recorded visits or exits from his home when the iPhone was approximately 80 meters away from the residence. Whiffin associated this with the iPhone leaving the range of the home's WiFi network. Whiffin noted that further research indicated that coming within 250 meters of an established Frequent / Significant Location may trigger the iPhone to record a visit.[15]

---

[14] Whiffin first posted the article on his website blog in 2020. It was peer reviewed and published in the DFIR (Digital Forensics and Incident Response) Review in 2024. Hyde was Chair of the DFIR Review at the time and one of the peer reviewers of Whiffin's article.

[15] Whiffin has opined that because the Frequent / Significant Locations feature is designed to identify a user's routines, the feature may record the iPhone's presence near a Frequent / Significant Location as useful information as the feature seeks to identify and tighten in on the locations relevant to the user.

11

Whiffin estimated that he has reviewed "hundreds of thousands" of Frequent Location data points and found them to be consistent with the actual location of the device, with a few obvious outliers as described in "Locations, Locations, Locations." He noted that other digital forensic examiners have reported similar experiences. Whiffin testified based on his testing, casework, and experience that Locations Services data points provide "very accurate" information of where an iPhone was located and are "generally accepted" as reliable within the digital forensics community.[16]

As to the Frequent / Significant Locations feature and associated FLH data, Whiffin opined that, accounting for the limitations regarding timestamps and possibility of recording visits when the iPhone is near but not within the uncertainty radius, FLH data is considered a "very good source" of information as to where an iPhone was and is "generally accepted" within the digital forensics community as a reliable estimate of an iPhone's location. Whiffin testified that he and other digital forensics examiners have reviewed FLH data and witnessed its accuracy firsthand. Likewise, Cellebrite and Magnet affirmed the accuracy of both Location Services and FLH data before developing tools to extract such information. In various cases, independent evidence has also corroborated Location Services data points and FLH data; for instance, surveillance video, party admissions, or custody records have demonstrated that the iPhone or user was present where the Locations Services data points and FLH data indicated.

Hyde similarly testified that FLH data is considered highly reliable evidence of the vicinity in which the iPhone was located – that is, that the iPhone was at or near the uncertainty

[16] Whiffin explained that the quote from his article "Harvest Locations" referenced in Defendant's brief before the SJC and footnoted in the SJC's decision, Arrington, 493 Mass. at 492 n.19, that "encryptedB location data" was not a "smoking gun" of where an iPhone was located, did not refer to Location Services data points or FLH data, but instead to the database of networks downloaded from Apple to an iPhone. Thus, it is not relevant to the issue of reliability of FLH data. The confusion stems from the fact that Apple employed a similar name for the database of Locations Services data points for the iPhone 8 and 9 (i.e., encryptedB – *Routine D*) as it then did for the database of downloaded cell towers and Wifi network beginning with the iPhone 10 (i.e., encryptedB – *Location D*).

12

radius. Hyde opined that FLH data is, in some regards, a better indication than individual Location Services data points because FLH data is based on an aggregation of numerous data points and thus, is less prone to outliers and anomalies. Further, Hyde testified that the fact that Apple's Frequent / Significant Locations algorithm is proprietary does not undercut the general acceptance of FLH data in the digital forensics community because, in that field, observation and testing is considered the best evidence of how software operates, not the raw code. As such, Magnet, Cellebrite and Apple have all tested and validated the data and functionality of the Frequent / Significant Locations feature in connection with developing their respective products.

## III.  FLH DATA RETRIEVED FROM ARRINGTON'S IPHONE

In 2022, Cellebrite, working in conjunction with Boston Police, performed a full file extraction[17] of Arrington's iPhone 6 which returned, *inter alia*, FLH data for 345 visits to 84 Frequent Locations. Of note, Frequent Location Visit 58 was centered at approximately 326 Harvard Street, with an uncertainty radius of 43.7 meters. The crime scene, 332 Harvard Street, is within that uncertainty radius. The FLH data recorded a visit to the location on March 31, 2015, with entry and exit timestamps of 10:36:10AM and 11:22:29AM, encompassing the time of the murder at approximately 10:51AM.[18] Because Location Services data points are automatically discarded within 72 hours, it was not possible to extract the data points upon which Frequent Location Visit 58 was based.

The Commonwealth has presented additional evidence indicating, to varying degrees, that Arrington's iPhone was in the vicinity of certain Frequent Locations at or about the times reflected in the FHL data. As to Frequent Location Visit 58, traffic camera images on the date of

---

[17] The technology to perform a full file extraction was not available in 2016 when Boston Police initially searched the iPhone.

[18] The FLH data includes a prior visit to the location on March 27, 2015, from 8:03:34PM to 10:04:48PM.

the murder depict a white sedan – which the Commonwealth contends was Arrington's – traveling southbound on Blue Hill Avenue (in the direction of Harvard Street) passing through the intersection with American Legion Highway at 10:35:11AM and through the intersection of Blue Hill Avenue and Talbot Avenue at 10:35:51AM, less than a minute before the FLH entry timestamp. Traffic cameras images farther south, at the intersection of Blue Hill Avenue and Westfield Street, did not show the same white sedan implying that the vehicle stopped or turned off of Blue Hill Avenue onto Harvard Street.[19] Next, a "selfie"-style photograph was taken with the iPhone at 10:40:29AM, which depicts Arrington seated in a car. In the background is a brick building. At 10:58:41AM, video captured from an MBTA bus depicts a white sedan parked on Paxton Street – a one block long street which intersects with Harvard St. and is around the corner from the crime scene. The Commonwealth presented a photograph of the brick façade of the building on the corner of Paxton Street[20] which appears to have similar features as the building appearing in the background of the selfie photograph.

Frequent Location Visit 70 recorded a visit to the Newton District Court on March 30, 2015, with entry and exit timestamps of 8:48:48AM and 9:47:07AM. The iPhone sent a text message at 8:15AM that day stating, "on my way to court." At 8:53AM, the iPhone was used to photograph the Newton District Court Daily Case List, depicting pretrial hearings scheduled in two of Arrington's cases.

Frequent Location Visit 73 documented a visit to the Chestnut Hill Mall from 7:26:23PM to 7:32:45PM on March 29, 2015. Two photographs extracted from the iPhone, taken at 7:31PM and 7:32PM, depict Arrington in a parking garage. Photographs taken by Kindig in the northwest

---

[19] The only road to legally turn off of Blue Hill Avenue between Talbot Avenue and Westfield Street is Harvard Street. Paxton Street also intersects with Blue Hill Avenue between Talbot Avenue and Westfield Street, but it is a one-way street toward Blue Hill Avenue.
[20] The building address is 949 Blue Hill Avenue.

14

corner of Chestnut Hill Mall parking garage appear to depict the same location as the two photographs of Arrington. These photographs were taken approximately 174 meters from the center point coordinates of the FLH data and approximately 83 meters outside of the 91.5-meter uncertainty radius.

Frequent Location Visit 30 recorded a visit from 3:11:42PM to 3:35:25PM on April 4, 2015, with coordinates corresponding to an Apple Store at 800 Boylston Street, Boston. Also extracted from Arrington's iPhone was a log of WiFi networks with which the phone had connected. At 3:18PM, within the time stamps, the iPhone connected to a WiFi network named "Apple Store" and with a basic service set identifier (BSSID) located at the same address.

Frequent Location Visit 310 recorded a visit to the Happy Days Diner at 63 Mill Street, Auburn, Maine, on February 26, 2015, from 10:23:02AM until 10:57:38AM. At 10:23AM, the iPhone connected to a "Happy Days Diner" WiFi network with a BSSID located at that address.

Frequent Location Visit 122 is centered at the Avalon apartment complex in Randolph with a recorded visit from 10:55:55PM to 6:45:14AM on March 25-26, 2015. The iPhone connected to a WiFi network with a BSSID location at the Avalon apartment complex, at 11:17PM on March 25 and again at 6:45AM on March 26, 2015.

## IV.     FLH TESTING PERFORMED BY DIGITAL EVIDENCE LAB (DEL)

In the summer of 2024, Kindig and other members of the DEL conducted additional testing of FLH data.[21] The DEL was unable to obtain the same iPhone model with the same operating system as Arrington's (an iPhone 6 operating on iOS 8.1),[22] and thus, used five test

---

[21] Prior to the first trial in this matter, Kindig conducted tests of the Location Services and the Frequent Locations features with an iPhone 5C operating the iOS 8.4.1, by visiting five different locations with the phone, two or three times each, for a total of twelve experiments and then comparing the Locations Services data points and FLH data generated by these visits with the iPhone's actual location. The Commonwealth has not specifically relied on this testing in connection with the present motion.

[22] When an iPhone user downloads a newer version of iOS, the new operating system overwrites the prior version. Thus, it can be difficult to obtain a specific model of iPhone operating on an older version of iOS.

15

iPhones intended to mimic the iPhone at issue as closely as possible:

1) iPhone 5 running iOS 8.0;
2) iPhone 5C running iOS 8.1;
3) iPhone 5C running iOS 8.1 (jailbroken)[23];
4) iPhone 5 running iOS 8.2; and
5) iPhone 4S running iOS 9.3.6.

The testing consisted of staff members driving the test iPhones and a Garmin GPS device to the area of the crime scene and parking across the street from 332 Harvard Street – either on the street in front 337 Harvard Street or 425 Harvard Street, or in the parking lot of 425 Harvard Street (a Department of Youth Services building). The vehicle then remained parked for at least thirty minutes with the iPhones inside. After each trial, the DEL staff collected the Locations Services data points and any FLH data from the test iPhones and compared the FLH data to actual location of the test iPhones. This test was repeated, twice per day, for forty-four days between July 16 and September 5, 2024.

Kindig determined that the iPhone 4S was malfunctioning and did not include the data from this iPhone in the testing results and findings.[24] The four remaining test iPhones recorded 127 Frequent Location visits, with each iPhone recording at least thirty visits. The actual location of test iPhones was within the FLH uncertainty radius for 101 of the 127 (79.5%) recorded visits. On the other 26 occasions, the iPhones were two to 24 meters outside the uncertainty radius, with the mean distance of 13 meters outside.[25]

---

[23] "Jailbreaking" is "removing the built-in limitations from an electronic device, such as a cell phone." Arrington, 493 Mass. at 483 n.11, citing Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/jailbreak [https://perma.cc/7MR6-2LJ5].

[24] During testing, Kindig determined that the iPhone 4s, running iOS 9.3.6, displayed repeated instances of malfunction, including consistent errors in timestamps. Thus, he did not include the results from in the test findings.

[25] Between July 16 and July 25, 2024, the iPhones recorded 37 Frequent Location visits and on only one occasion, was the true location outside the recorded uncertainty radius. The remaining 25 instances when the actual location was outside the uncertainty radius occurred between July 26 and August 11, 2024, when the testers parked in the Department of Youth Services parking lot. However, the true locations fell within the uncertainty radii on every test conducted from August 12 to September 5, 2024.

16

Regarding the timestamps, on 44 of the 127 Frequent Location visits, the entry timestamp was after the documented start time of the test, ranging from one to six minutes later. On a few occasions, the FLH data recorded entry timestamps minutes before the test began. Seventeen records recorded exit timestamps of at least five minutes after the test stop time, with largest difference being 32 minutes after the test period ended. On four occasions a test iPhone's FLH data recorded a one Frequent Location visit on a single day rather than two – i.e., the FLH data recorded timestamps only for the first entry and the last exit and failed to record the tester's interim exit and reentry to the area between the morning and afternoon tests.

The FLH data generated displayed some variation across the test iPhones. For example, after the first day of testing (two visits), three iPhones recorded a Frequent Location visit, with uncertainty radii varying from 41.5 meters to 62.5 meters, while the iPhone 5 running iOS 8.2 did not record a Frequent Location visit. After the second day of testing, all four iPhones generated an FLH record, with the uncertainty radii varying from 30.8 meters to 59.3 meters, and the iPhone 5 running iOS 8.2 recording the smallest radius.

Whiffin testified that the results of the DEL testing were consistent with his opinion that FLH data is a reliable estimate of where an iPhone was at a given time. Whiffin and Hyde also both endorsed the DEL's testing methodology, with Whiffin noting that it was "same approach that [he] would have taken." Whiffin and Hyde noted that the testing was conducted accordance with NIST guidelines and best practices, in that the DEL (1) tested multiple devices, two of which used the same operating system as Arrington's iPhone (iOS 8.1) and other iPhones using the immediate predecessor and successor versions of iOS[26]; (2) factory reset all the iPhones

___

[26] Both Whiffin and Hyde opined that while it is ideal to obtain the same model and operating system as the subject device, that is not always possible particularly for older iPhones because new operating systems overwrite their predecessors. The best alternative is to use a variety of similar models and operating systems, as was done here. Hyde testified that Arrington's iPhone 6 had newer technology and could detect WiFi and Bluetooth networks that

17

before testing; (3) tested all the iPhones together in the specific area of the crime scene; (4) conducted each test for a sufficient length of time; (5) documented and collected data after each test; (5) used a separate GPS device to annotate the iPhones' actual locations; and (6) obtained an adequate sample size from each iPhone.

## V.     DEFENDANT'S WITNESS

Defendant offered the testimony of a certified cellular forensic examiner, Steven Verronneau ("Verronneau"), as a rebuttal expert. Verronneau's testimony focused on purported deficiencies in DEL's testing – for example, reliance on the Garmin GPS and street addresses rather than more specific documentation of the actual test locations – and instances in which the FLH data deviated from the actual location of the test iPhones at given times. The Court does not find that Verronneau's testimony in this regard added anything beyond what Kindig, Whiffin, and Hyde had already acknowledged.[27] Nor does the Court credit Verronneau's testimony that FLH data is not generally accepted as reliable within the digital forensics community. The record did not establish that Verronneau had an adequate basis to render such an opinion about general acceptance in the field. Rather, his testimony as to a lack of "general acceptance" appears to be based solely upon his own interpretation of the DEL's test results and Defense counsel's exceedingly narrow framing of the standard.[28]

### RULINGS OF LAW

The Commonwealth seeks to introduce FLH evidence from Arrington's iPhone to show that the phone was in the vicinity of the crime scene when it received a call from Arrington's

---

an iPhone 5 or 5C could not. Thus, Arrington's iPhone would have been able to collect more data and have a higher level of precision than the iPhones tested.

[27] Additionally, as discussed *infra*, these criticisms go to the weight of evidence not the threshold question of reliability.

[28] Defense counsel asked whether there was a general consensus within the digital forensics community that FHL data "establish[es] that a phone was within the uncertainty circle or within a few meters of it during a particular time period." Neither the Commonwealth nor any witness claimed that FLH data provides such a level of precision.

18

alleged co-conspirator and when the murder occurred. The admission of such technical evidence is governed by the familiar Daubert-Lanigan standard, Arrington, 493 Mass. at 490, which is "designed to eliminate 'junk science', or mere *ipse dixit* declarations of scientific reliability, as competent evidence." Peterson v. Board of Assessors of Boston, 62 Mass. App. Ct. 428, 433 (2004).[29]

## I. SUFFICIENCY OF KINDIG'S QUALIFICATIONS

In his pre-hearing opposition to the Commonwealth's Motion, Defendant argued that Kindig is not qualified to testify regarding FHL data. Notably, Defendant has not pressed this argument in his post-hearing submission, and it may be resolved without elaborate discussion.

Under the Daubert-Lanigan analysis, the Court must exclude evidence proffered by an expert who is not qualified to provide such testimony *or* whose opinion lacks reliability. Commonwealth v. Rintala, 488 Mass. 421, 426 (2021) (emphasis added). Whether a proposed expert is qualified and whether the underlying methodology is reliable are separate inquiries. Id.; Palandjian v. Foster, 446 Mass. 100, 109 n.12 (2006). Here, once again, the substance of Defendant's objections goes not to Kindig's qualifications but "whether the Commonwealth ha[s] met its burden of establishing the reliability . . . of FLH data." Arrington, 493 Mass. at 491. Based on his "education, training, experience and familiarity with the subject matter," Palandjian, 446 Mass. at 106, Kindig is sufficiently qualified to speak to the issues addressed in his testimony.[30]

---

[29] Although the court's inquiry generally "must begin" by determining relevance, Commonwealth v. Hinds, 487 Mass. 212, 218 (2021), there is no dispute that evidence placing Defendant's phone near the scene of the crime at the time is relevant to the extent it is reliable. See Arrington, 493 Mass. at 486 ("Because [the Commonwealth's] case at trial will rely significantly on testimony by a cooperating witness procured in exchange for a reduced sentence . . . evidence corroborating the cooperating witness's testimony . . . might fairly be described as 'critical' to the prosecution's case.").

[30] Specifically, the Commonwealth has offered Kindig's testimony as to (1) the general functioning of the Location Services and Frequent / Significant Locations features on Apply iOS devices and the data generated therefrom; (2) the data extracted from Arrington's iPhone; and (3) his testing and findings regarding Apple iPhones. Kindig does

## II.    RELIABILITY OF FLH EVIDENCE

The Daubert-Lanigan analysis is grounded in the test of admissibility under Rule of Evidence 702, which requires that expert opinion be based on sufficient facts, reliable methods and applications of those methods, and assist the trier of act. Commonwealth v. Lanigan, 419 Mass. 15, 25 (1994), citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-589 (1993). The Court acts as a gatekeeper and assesses "whether the theory or methodology underlying the proposed testimony is sufficiently reliable to reach the trier of fact." Arrington, 493 Mass. at 490 (quotation omitted). "Because no court in the Commonwealth has previously deemed FLH data to be reliable, the Commonwealth b[ears] the burden of establishing [its] reliability. . . by a preponderance of the evidence." Id. at 491 (citation omitted).

In conducting this threshold analysis, the Court considers five factors:

"whether the scientific theory or process (1) has been generally accepted in the relevant scientific community; (2) has been, or can be, subjected to testing; (3) has been subjected to peer review and publication; (4) has an unacceptably high known or potential rate of error; and (5) is governed by recognized standards."

Arrington, 493 Mass. at 490-491 (quotation omitted). These factors are, however, not exclusive. Davis, 487 Mass. at 454. They serve as guideposts for what is, ultimately, a flexible inquiry. Canavan's Case, 432 Mass. 304, 314 n.5 (2000); Daubert, 509 U.S. at 594. See Palandjian, 446 Mass. at 111 ("Not all of the factors . . . will be applicable in every case."). See also

---

not require more specialized training to opine on these matters. See Commonwealth v. Crouse, 447 Mass. 558, 569 (2006) ("There is no requirement that testimony on a question of discrete knowledge come from an expert qualified in that subspecialty rather than from an expert more generally qualified." [quotation omitted]); Chr. Hansen HMO GmbH v. Glycosyn LLC, No. 22-CV-11090-NMG, 2025 WL 2176929, at *2 (D. Mass. Mar. 31, 2025) ("[A]ny gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." [quotation omitted]). See also United States v. Jimenez-Chaidez, 96 F.4th 1257, 1267 (9th Cir. 2024) ("Cellebrite report that contained [ ] information [ ] in a format that was easily understandable to anyone familiar with GPS coordinates. [FBI] Agent['s] [ ] testimony about this information and how it was obtained largely was not opinion testimony, and to the extent it was, it was based on his perception and not specialized knowledge."). To the extent Kindig testified as to the functioning of the Location Services and Frequent Locations more broadly, his testimony was merely consistent with the opinions offered by Whiffin and Hyde. See Iconics. Inc. v. Massaro, 266 F. Supp. 3d 461, 469 (D. Mass. 2017) ("[A]n expert may rely on . . . other expert conclusions to form an opinion.").

20

Davis, 487 Mass. at 454 (trial judge may "need to consider other factors depending on the nature of the expert testimony"); Commonwealth v. Camblin, 478 Mass. 469, 476 (2017), quoting Canavan's Case, 432 Mass. at 314 n.5 ("Differing types of methodology may require judges to apply differing evaluative criteria"). The Court thus "has broad discretion" in its gatekeeping role, Palandjian, 446 Mass. at 111, and "may also look to [its] own common sense, as well as the depth and quality of the proffered expert's education, training, experience, and appearance in other courts to determine reliability." Commonwealth v. Pasteur, 66 Mass. App. Ct. 812, 826 (2006) (internal quotation omitted). "The overarching issue [of the Daubert-Lanigan analysis] is 'the scientific validity—and thus the evidentiary relevance and reliability'" of the evidence. Lanigan, 419 Mass. at 25 quoting Daubert, 509 U.S. at 594-595. Accord Commonwealth v. Hinds, 487 Mass. 212, 220 (2021) ("Under the Daubert-Lanigan standard, 'the touchstone of admissibility is reliability.'"), quoting Commonwealth v. DiCicco, 470 Mass. 720, 729 (2015). However, the "reliability of scientific evidence is distinct from its strength," Commonwealth v. Fernandez, 458 Mass. 137, 150 (2010), the weight and persuasiveness of the evidence "is the province of the jury," not the Court. Hinds, 487 Mass. at 224.

### A. General Acceptance

General acceptance in the relevant scientific community remains the primary factor in assessing the reliability of scientific evidence. Although the proponent of scientific evidence may demonstrate its reliability by other means, "Lanigan's progeny make clear that reliability can still be established by general acceptance alone, without regard to the other [ ] factors." Davis, 487 Mass. at 454. See Camblin, 478 Mass. at 475 ("In Lanigan, . . . [w]e did not [ ] entirely abandon [the] prior test . . . which focused on 'whether the community of scientists involved generally accepts the theory or process.'"), quoting Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

21

See also Commonwealth v. Williams, 475 Mass. 705, 720 (2016) ("A judge need not conduct an extensive inquiry into the validity of an expert's testimony if . . . the expert's methodology has previously been accepted as reliable in the relevant field." [quotation omitted]). Thus, "in many cases general acceptance will 'be the significant, and often the only, issue.'" Davis, 487 Mass. at 454, quoting Lanigan, 419 Mass. at 26.

The relevant scientific community must be "sufficiently broad to permit the potential for dissent." Commonwealth v. Powell, 450 Mass. 229, 239-240 (2007). Accord Canavan's Case, 432 Mass. at 314 n.6. However, "[u]nanimity of opinion among the relevant scientists is not essential even under the general acceptance test." Lanigan, 419 Mass. at 27. In determining whether a scientific method has been generally accepted by experts in the field, the Court may consider the testimony of experts in the record as well as articles written by experts and the conclusions of other courts. Commonwealth v. Curnin, 409 Mass. 218, 223 (1991); Commonwealth v. Kater, 388 Mass. 519, 527 (1983).

Here, the Commonwealth has offered testimony of two recognized experts in the relevant scientific community of digital forensics. Whiffin and Hyde both testified that FLH data is generally accepted in the digital forensics community as reasonable estimate of where an iPhone was located at a given time. Their credible conclusions in this regard are grounded in their significant training and experience in the field and with Apple iOS devices and the associated location features and data. Both Whiffin and Hyde held high ranking positions at leading digital software companies and oversaw commercial software tools developed to extract location information from iPhones, including FLH data. Their opinions were also based on extensive casework demonstrating the reliability of FLH data through firsthand experience and interactions with other digital forensic examiners in the field. Whiffin has also studied and published on the

22

subject matter while Hyde has served as a peer reviewer and covers this subject matter in her graduate-level digital forensics course.

Whiffin and Hyde testified – and Defendant effectively concedes – that Location Services data points (the raw material of the Frequent Locations feature) are generally accepted as reliable. As Hyde opined, because FLH data aggregates a multitude of these underlying data points, it is less likely to be subject to anomalies and more likely to provide an accurate estimate of an iPhone's location. As Whiffin testified, iPhones are ubiquitous, and the Frequent / Significant Locations feature has existed for more than a decade. Digital forensic examiners commonly acknowledge the reliability of FLH data as observed through both their own personal iPhone use and in various cases in which Locations Services data points and FLH data have been corroborated by independent evidence.

Additionally, it is known in the digital forensics community that Apple tests and retests it location features prior to launching them in successive models of the iPhone and versions of iOS. While the results of Apple's testing and the specific coding of the algorithm are not publicly known, Apple has continued to employ the technology as commercially beneficial with its functioning essentially unchanged, thus indicating that Apple has determined the process to be useful and reliable. See State v. Pierce, 222 A.3d 582, 591-592 (Del. Super. Ct. 2019), aff'd, 236 A.3d 307 (Del. 2020) (fact that Google Wi-Fi Location Data is generated for commercial purposes provides indicia of reliability) citing Carpenter v. United States, 585 U.S. 296, 309-310 (2018). See also Arrington, 493 Mass. at 498 (Lowy, J., concurring) ("It is possible that a party may not need an expert from Apple to testify about the proprietary algorithm creating FLH data to establish gatekeeper reliability."). Indeed, the Frequent / Significant Locations feature would be of no benefit to Apple or its customers if it provided erroneous information. Likewise,

23

Cellebrite and Magnet have developed software tools to extract FLH data only after determining, based on their own reviews and interactions with customers, that such data is useful and reliable. As iPhones have now employed the Frequent / Significant Locations feature for a dozen years, one would anticipate that significant errors in the FLH data would prompt consumer complaints, remedial actions by Apple and forensic software companies, and/or forensic examiners to further examiner or disregard such data. But there is no such evidence in the record. Defendant has not produced any rebuttal evidence that FLH data is unreliable (at least beyond the known limitations of the technology discussed above), whether in the form of expert testimony, scholarly articles or testing, or elsewise.

To be sure, FHL data has not been subject of significant testing or scholarly writing, and evidence of the data's accuracy is largely anecdotal. But given the apparent consensus among the digital forensics community as to how the Frequent / Significant Locations feature functions and the import of FLH data, the general paucity of traditional, peer-reviewed analysis is not particularly surprising, much less discrediting of Whiffin's and Hyde's informed opinions that FLH data is generally accepted as reliable in the field. As indicated here and in other cases, such formal testing of such data is time-consuming. See, e.g., Pierce, 222 A.3d at 589 (testing of analogous Android feature conducted over two years). Apple releases new models of the iPhone and new versions of iOS roughly annually. Thus, while there is no suggestion that the functionality of the Frequent / Significant Locations feature has materially changed since its inception, the incentive to perform extended testing is significantly diminished where results for any subset of iPhone models and operating systems will inevitably be subject to critique as distinguishable or outdated. Indeed, the record does not suggest that the dearth of scholarly material on FLH data is attributable to any lack of examination or uncertainty regarding the data

24

in the relevant scientific community. To the contrary, the record indicates that the digital forensics community has examined the technology and data for many years, understands its functioning and level of precision, has observed its reliability in field, and has not deemed it worthwhile to pursue extensive (and likely costly) formal testing to confirm what is already known or, at minimum, not seriously contested among the examiners.

The Commonwealth has sufficiently established that FLH data is generally accepted as reliable in the relevant scientific community. That alone is sufficient to admit the evidence. See Davis, 487 Mass. at 454; Williams, 475 Mass. at 720.

**B. Testing**

Even if the Commonwealth had failed to demonstrate that FLH evidence was generally accepted, the remaining factors also support admitting the evidence.

The Daubert-Lanigan second factor is whether the evidence can be or has been tested. Arrington, 493 Mass. at 493. Relevant considerations include whether: (i) the tests were related to the expert's professional work; (ii) there was a basis in existing scientific literature or research for methodology or experiments; (iii) the experiments were performed consistently with scientific principles; (iv) the expert accounted for other conditions; (v) the expert validated or repeated the tests; and (vi) the findings were objective as opposed to subjective. Rintala, 488 Mass. at 440-441.

Here, the testing was related to Kindig's and the DEL's professional work and was conducted in accordance with NIST guidelines and best practices in the field of digital forensics. Although the DEL was unable to replicate the exact model and operating system of Arrington's iPhone, it tested four iPhones of the preceding models (5 and 5S), using the same or similar operating systems as the subject phone. Each test trial was repeated twice per day, for 44 days,

25

generating a sufficient sample size from each iPhone. The testing was conducted near the scene of the crime to evaluate the iPhones' response to that specific environment.[31] In comparison to the mere twelve experiments on one iPhone which Kindig conducted prior to the first trial, the DEL's testing here was far more robust and analogous to the type of testing the SJC endorsed. See Arrington, 493 Mass. at 495 n.24.[32] Lastly, the FLH data provides objective results. Although there was some variation across the iPhones, the actual locations of the four iPhones most similar to Arrington's iPhone was within or near the uncertainty radius on all occasions.[33]

The fact that Kindig discarded the results of the iPhone 4S running iOS 9.3.6 based on errors in the timestamps, does not alter this conclusion. In addition to being the least similar to Arrington's iPhone both as to the model and operating system, the evidence corroborating the FLH data from Arrington's iPhone indicates that it was not suffering a similar malfunction.

As Defendant notes, the DEL performed the only testing of FLH data reflected in the record. Such evidence produced "solely to assist the Commonwealth's prosecution of the

---

[31] While it is generally appropriate to conduct experiments under "a broad range of conditions," see Arrington, Mass at 495, quoting National Research Council, Strengthening Forensic Science in the United States: A Path Forward 112 (2009), Hyde opined that it is considered best practice to test the Apple location features at issue at or near the crime scene or the site where the FLH data was generated. See Ex. 59, Hyde Report, quoting Lyle, J.R., et al. Digital Investigation Techniques: A NIST Scientific Foundation Review, NIST Internal Report NIST IR 8354 available at https://doi.org/10.6028/NIST.IR.8354 ("It is not feasible to test all combinations of tools, run time environments, and digital evidence sources."). Indeed, the core criticism of the GPS-based location evidence at issue in Davis was that the testing was not conducted under similar conditions as the crime scene. 487 Mass. at 459.

[32] The SJC contrasted Kindig's initial testing with testing described in Pierce, 222 A.3d 582. There, an engineer constructed a test-rig of twenty cell phones and analyzed communications over two years to determine the accuracy of Google Wi-Fi location data and did so near the scene of the crime. Id. at 589. In so doing, the SJC noted, "we do not suggest that the exact credentials or testing procedures used in Pierce are what would be required to show that FLH data are reliable." Arrington, 493 Mass. at 495 n.24. Indeed, in most cases, a defendant's right to a speedy trial would preclude such prolonged testing. Nonetheless, the additional testing DEL performed here appears substantially analogous to that described in Pierce, and the Court credits the testimony of the Commonwealth's two digital forensic experts who found the methodology to be consistent with best practices.

[33] Whiffin and Hyde also explained the increased number of visits and time spent at a Frequent Location allows an iPhone to adjust the center point coordinates and uncertainty radius based on additional location data points and changes in the user's routines. The testing results appear consistent with their testimony. Cf. Arrington, 493 Mass. at 494 (noting that Commonwealth's expert (Kindig) was "unable to explain why the uncertainty radius for a frequent location changed or whether data from previous visits contributed to how FLH data changed after a subsequent visit to the location").

defendant" is subject to close scrutiny. Rintala, 488 Mass. at 439. But the model and operating system of a subject iPhone and the vicinity of the crime cannot be predicted and tested before the crime occurs. And given the frequency with which Apple releases new iPhones and updates to IOS, any testing of more than general relevance will necessarily have to occur in connection with an active case. Additionally, the mere absence of other testing does not, *ipso facto*, tip this factor in against admissibility of FLH data. See Davis, 487 Mass. at 459-460 (location evidence admitted based on single course of formal testing). The testing that DEL performed here is replicable in its most relevant aspects. While changing environmental factors, including the assortment of assisted-GPS sources in a location and variations across differing iPhones may mean that no such test of FLH data can be recreated exactly, nothing prevents the Defendant or another entity from conducting similar testing to thereby stress test the Commonwealth's position that FLH data places Arrington's iPhone in the vicinity of the crime scene during the relevant time period. Indeed, the ability to conduct similar testing militates in favor of admitting FLH evidence. Likewise, while Whiffin and Hyde did not examine and validate the data underlying the DEL's testing, there is no indication that Defendant has been prevented from scrutinizing it.

Defendant's objections to DEL's testing methods and the differences between the test iPhones and Arrington's iPhone – for instance, that the test iPhones lacked SIM cards and ran apps using Location Services during testing, that the FLH data in Arrington's iPhone indicated only two visits to the crime scene, and that the underlying Location Services data points could not be extracted from Arrington's iPhone – are matters commending themselves to cross-examination rather than exclusion of FLH evidence. See Davis, 487 Mass. at 459-460 (objection that testing of location data "occurred in prime conditions that did not simulate real-world

27

accuracy, especially in an urban environment . . . went to the weight of the evidence, not its admissibility"). See also Rintala, 488 Mass. at 429 (2021) (contention that expert's "opinion was based on inadequate information goes to the weight and not the admissibility of the testimony"); Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 359-360 (2008) (expert's failure to account for all variables goes to weight of evidence not admissibility). "It is not the function of the court to determine whether [the] expert did everything that an expert could do in coming to his conclusion, or whether every piece of information he relied upon was indisputably true and accurate. These are considerations that may influence the jury's determination as to which expert to believe [ ], but are not part of the court's threshold inquiry." L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc., 121 F. Supp. 2d 147, 155 (D. Mass. 2000). See, e.g., In re Sanches, No. 24-P-1155, 2026 WL 772556, at *2 (Mass. App. Ct. Mar. 19, 2026) (Rule 23.0) ("[A]ny perceived limitations of the data can be explored on cross-examination."); United States v. Reynolds, No. 1:20-CR-24, 2021 WL 3750156, at *4 (W.D. Mich. Aug. 25, 2021), aff'd, 86 F.4th 332 (6th Cir. 2023) ("Disputes regarding accuracy [of TRAX algorithm] are better left to adversarial examination, rather than exclusion.")

At minimum, the results of the DEL's testing provide a relevant baseline to assist the jury's analysis, thus supporting admissibility of the evidence. See Davis, 487 Mass. at 454 (admitting location evidence where expert acknowledged conditions that could impact the method's accuracy and test provided "helpful . . . baseline"). Defendant's critiques do not suggest otherwise. As to distinctions between Arrington's iPhone 6 running iOS 8.1 and the tested iPhone 5's and 5S's running iOS 8.0, 8.1 and 8.2, Hyde testified that Arrington's iPhone would have been as or more accurate than the tested models. While the pertinent FLH data from Arrington's iPhone indicated only two visits (totaling approximately three hours), test iPhones

produced similar results after two visits and similar time at the scene. Likewise, Defendant objects that "once an FLH site [i]s created a subsequent visit could be recorded even if the phone only got near, but not inside, the edge of the uncertainty circle." Because this phenomenon occurs *after* a Frequent Location is established, i.e., upon a third visit or later, it would appear to have no impact on the pertinent FLH evidence based on two visits by Arrington's iPhone.[34]

As FLH data has been and can be subjected to objective testing, this factor favors admissibility.

## C. Peer Review and Publication

The next consideration is whether FLH evidence has been the subject of published and peer reviewed articles. This "prong of the Daubert-Lanigan standard serves a function similar to the general acceptance test; in essence, it requires a judge to determine whether the scientific theory underlying the disputed evidence has been accepted by the relevant scientific community." Camblin, 478 Mass. at 478.

Here, the only peer-reviewed article the Commonwealth offered in support of its Motion is "Locations, Locations, Locations" authored by Whiffin, which addresses aspects of the Significant Locations feature (the successor to Frequent Locations) and the reliability of the underlying Locations Services data points based on testing performing on an iPhone 6 operating iOS 12.4.1. While the article provides information relevant to functioning of the Frequent Locations feature and the manner in which FLH data is generated, it does not, standing alone, tip this factor in favor of the admissibility of the evidence at issue. Nonetheless, as discussed supra,

---

[34] Consistent with the known incidence of iPhones triggering a visit record by being near an established Frequent Location but not within the uncertainty, 25 of the 26 occasions in which a test iPhone was near but not within the FLH uncertainty radius occurred in the latter portion of the testing and after the DEL began parking in the DYS lot as opposed to on the street. During the early testing, where the test iPhones had made fewer visits to the scene, only once was the actual location of a test iPhone outside the recorded uncertainty radius.

29

the record suggests that the absence of scholarly writing on FLH data is not indicative of an absence of examination in the field.

## D. Rate of Error

The next Daubert-Lanigan factor asks whether the process "has an unacceptably high known or potential rate of error." Davis, 487 Mass. at 454. Defendant points to the Commonwealth's own testing – indicating that (1) the test iPhones actual locations were within the uncertainty radius in only 79.5% of the results; (2) entry and exit timestamps were off by minutes; and (3) on four occasions a test iPhone did not record an exit and re-entry into the test area – as establishing that the FLH data has an unacceptably high rate of error. The Court does not agree.

Defendant takes the position that any instance in which an iPhone's actual location deviated from the time and location reflected in the FHL data, constitutes an "error" for the purposes of assessing the data's reliability. Such a rigid standard is not suitable given the purpose for which the Commonwealth seeks to introduce FLH evidence – i.e., that Arrington's iPhone was in the vicinity of the murder scene bookending the time the crime occurred. It is known and acknowledged that FHL data cannot establish with absolute certainty that an iPhone was within the uncertainty radius (as opposed to nearby), entered and exited at the exact times recorded in the timestamps, or that it remained within the radius for the entire time recorded. The Commonwealth nor its experts have ever claimed that FLH data provides such precision, nor does the Defendant cite any caselaw suggesting that the Daubert-Lanigan analysis requires the Commonwealth to prove such a level of certainty.

To the contrary, the question is whether the evidence is sufficiently reliable to assist the trier of fact. Arrington, 493 Mass. at 490; Lanigan, 419 Mass. at 25. The Commonwealth's

30

experts acknowledge the limitations of FLH data and that it may not reflect every instance or the exact times a cellphone exits and enters the radius of the frequent location, particularly where the cell phone leaves the radius only briefly and remains in the same vicinity. The Commonwealth does not introduce FLH data to claim that the iPhone was continuously within the frequent location radius between the entry and exit times. Rather, the Commonwealth's experts testified that FLH data is evidence that the iPhone was in the vicinity of the frequent location radius – typically, inside the radius or within tens of meters, but not more than 250 meters outside – at times between the timestamps, give or take a matter of minutes on each end. These are facts, once explained, that a reasonable juror can understand and assess. See Commonwealth v. Pytou Heang, 458 Mass. 827, 851 (2011) (evidence not inadmissible "merely because it is inconclusive,"; weight accorded is for the jury); Pierce, 222 A.3d at 592 ("The technology, once explained, will be well within the jury's capability to comprehend and weigh.").

Consistent with the foregoing, although the DEL found a tested iPhone was outside the uncertainty radius on roughly 20% of visits, never was the actual location of the test iPhone farther than 24 meters from the uncertainty radius. Likewise, timestamps generally deviated from the actual start and end times of testing by a few minutes. These discrepancies or deviations are entirely consistent the recognized limitations of the FLH data, and none cannot be fairly characterized as "errors" or "false positives" in the sense that the test iPhones were not in the vicinity between the timestamps reflected in the FLH data. Put elsewise, the testing data did not record a visit on a day when no visit occurred, nor did the FLH data place a test iPhone at some other location. Nor does the evidence extracted from Arrington's iPhone suggest that the FLH data has an unacceptability high rate of error. For instance, the photographs of Arrington at the Chestnut Hill Mall were taken approximately 90 meters (i.e., less than 200 meters) outside the

31

FLH uncertainty radius and at the time of the last timestamp. Whiffin explained that the FLH data may record an exit timestamp when the iPhone is tens of meters away from the uncertainty circle reflecting when it is last connected to an assisted-GPS source. Common sense also suggests that an individual visiting the Chestnut Hill Mall on multiple occasions may have entered the building on some or all of those occasions and did not spend the entire time in the parking garage. Likewise, the evidence that Arrington's iPhone connected with a WiFi source at the Avalon Apartments at the same time as reflected in the FLH data exit timestamp is consistent with Hyde's and Whiffin's descriptions of how the technology functions. Cf. Arrington, 493 Mass. at 494 n.22.

The imprecisions of FLH data are all the proper subject of cross-examination. But the inability of FLH to place an iPhone at an exact location at an exact time does not mean that the evidence is unreliable or has an unacceptable rate of error. There is no suggestion anywhere in the record that FLH data is prone to false positives – i.e., that it records visits to a Frequent Location when the iPhone was never in the vicinity between the timestamps recorded. See United States v. Monteiro, 407 F. Supp. 2d 351, 367 (D. Mass. 2006) ("The lack of false positives is an especially important figure because it indicates a somewhat reduced risk of wrongfully accusing a defendant."), citing United States v. Mitchell, 365 F.3d 215, 259 (3d Cir. 2004) (noting that the rate of false positives is the critical figure in Daubert analysis). As Hyde testified (colorfully), the FLH data does not place an iPhone "in the Congo" or some other "distant location" from where it actually was, or more to the point, that FLH data is at risk of placing an iPhone in Dorchester on a given morning when it was in Somerville the entire time.[35]

---

[35] Notably, Defendant has not offered any evidence, whether in the form of expert testimony, testing or scholarly articles to indicate that FLH data is prone to false positives, as defined supra. See Mitchell, 365 F.3d at 240 ("While . . . the burden of proof [is] on the proponent of the evidence (here, the government), . . .this does not mean that the burden is static[.] . . . [W]here what is sought to be proved is essentially a negative (i.e., the absence of false

32

The Court finds that this <u>Daubert-Lanigan</u> factor favors admission of FLH evidence.

### E. <u>Existence of Recognized Governing Standards</u>

The fifth <u>Daubert-Lanigan</u> factor asks whether the evidence is governed by the recognized standards. The Commonwealth has cited regulations promulgated by Federal Communications Commission which establish accuracy requirements for cell phone location services so that they may support 911 services. See Matter of E911 Location Accuracy Requirements, Fourth Report and Order, 30 F.C.C.R. 1259 (2015). These regulations appear to concern location features generally, such as Apple's Location Services and analogous features of Android operating systems, and not FLH data specifically. As the regulations address only the underlying location data points, they provide only a modicum of support for the reliability of FLH data. See <u>Arrington,</u> 493 Mass. at 497 n.25.

### F. <u>Reliability based on Daubert-Lanigan Factors</u>

The foregoing analysis of the <u>Daubert-Lanigan</u> factors compels the Court to two conclusions. First, Apple's Frequent / Significant Locations feature and the FLH data generated therefrom has not been subject to significant formal testing or scholarly analysis. The record includes the single course of testing conducted by the Commonwealth in connection with this case, and one relevant, peer-reviewed publication. While Apple and digital forensics companies, such as Cellebrite and Magnet, have reportedly tested the feature and data, the scope of such testing and the specific results are not before the Court. Apple's algorithm is, likewise, not

---

positives) . . . [and] [t]he government's experts . . . testified to their being unaware of significant false positive identifications . . . , it becomes quite reasonable to shift the burden to the opponent of the evidence [ ] to counter this claim with affirmative examples.").

publicly known. These facts plainly weigh against the admission of FLH data. However, scholarly review and publication are "not a *sine qua non* of admissibility." <u>Ready</u> v. <u>Commonwealth</u>, No. Civ. A. 00-10390 SDP, 2002 WL 1255800, at *16 (Mass. Super. May 17, 2002) (Muse, J.), aff'd sub nom. <u>In re Ready</u>, 63 Mass. App. Ct. 171 (2005), quoting <u>Daubert</u>, 509 U.S. at 593. See also <u>Daubert</u>, 509 U.S. at 593-594 ("Some propositions . . . are too particular, too new, or of too limited interest to be published. . . . The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised."). More broadly, the <u>Daubert</u>-<u>Lanigan</u> factors are not an end in themselves, and the Court does not merely tally those for and against admissibility. Rather, the factors are markers, guideposts, designed to inform that actual gatekeeper inquiry posed to the Court – that is, whether the evidence is sufficiently reliable to reach the jury. <u>Canavan's Case</u>, 432 Mass. at 314 n.5; <u>Daubert</u>, 509 U.S. at 594

The second conclusion, and the one that controls the outcome of the present motion, is that despite a dearth of scholarship and a lack of access to the algorithm code, the record demonstrates that FLH data is sufficiently reliable for the purposes for which it is offered in this case. Foremost, the Commonwealth has demonstrated, through the testimony of two established experts, that FLH data is generally accepted as reliable by the digital forensics community. Defendant has not put forth any credible evidence to the contrary. While the community's consensus appears to be based predominantly upon anecdotal experience, it has been developed over years of casework and observation, and the paucity of more formal examination does not suggest a lack of general acceptance. The reliability of FLH data has been corroborated by independent evidence in individual cases – akin to the record the Commonwealth has put forth

34

corroborating the FLH data extracted from Arrington's iPhone. The fact that the forensic software tools, such as those offered by Cellebrite and Magnet, support the extraction and analysis of FLH data, and that Apple has tested and maintained the feature without any relevant, discernable change in in its function, also support the conclusion that FHL data is generally accepted as reliable by the relevant community. As noted, the proffered evidence may be admitted on this basis alone. See, supra, Davis, 487 Mass. at 454; Camblin, 478 Mass. at 475.

And even if it did not, the Commonwealth has now performed testing of FLH data consistent with industry standards and best practices, the results of which are consistent with both the testimony of Whiffin and Hyde, and the purpose for which the Commonwealth offers the FLH evidence – to place Defendant's iPhone in the vicinity of the crime scene during the relevant time period. Defendant understandably points to the limitations of the FLH data and its inability to reflect the exact location of an iPhone at the exact time reflected. But the Commonwealth's witnesses readily acknowledge the same. There is no claim that the FLH data definitively places the Defendant's iPhone within the uncertainty radius for the entire time reflected in the timestamps. But crucially, there is no suggestion the FLH data is prone to false positives, such that the pertinent record at issue may have been generated despite the iPhone never having been in the vicinity of crime scene between the timestamps recorded.[36]

The limitations of FLH data, once explained, are within the ken of a lay jury, and they are all proper fodder for cross-examination and rebuttal evidence. See Hinds, 487 Mass. at 224-225, quoting Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means

---

[36] Further, as noted, the concerns identified regarding the precision of timestamps and records of visits after a Frequent Location has been established do not appear to particularly undermine to the FLH data at issue here, which was based on two visits and recorded timestamps fifteen minutes before and 31 minutes after the approximate time of the murder.

of attacking [even] shaky but admissible evidence." [further quotations omitted]); Lanigan, 419 Mass. at 26 ("Of course, if the judge rules the opinion evidence admissible, that ruling is not final on the reliability of the opinion evidence, and the opponent of that evidence may challenge its validity before the trier of fact."). The Court, however, must confine itself to its gatekeeper role and "leave the determination of the credibility [ ] and the weight to be attributed to the [evidence] to the trier of fact." Hinds, 487 Mass. at 225. Here, the Commonwealth has demonstrated that "FLH data can reliably establish that an iPhone was in an approximate area at an estimated time" sufficient to satisfy gatekeeper reliability. See Arrington, 493 Mass. at 498 (Lowy, J., concurring).

<b><u>CONCLUSION AND ORDER</u></b>

For the foregoing reasons, the Commonwealth's Motion is **ALLOWED**.

**<u>SO ORDERED</u>**.

Mary K. Ames
Justice of the Superior Court

Dated: April 16, 2026

36