# Voir Dire By Two Lawyers: An Essential Safeguard

Alice M. Padawer-Singer,
Andrew Singer and Rickie Singer

Although a totally impartial jury probably exists nowhere outside books of legal theory,[1] the ideal of impartiality is basic to our system of justice. It is to approach this ideal that voir dire examinations of jurors are conducted. The men and women called to jury duty are questioned and challenged in order to select from among their ranks the best—that is, the most impartial—jury.

A jury is selected in connection with a particular trial, and not as an impartial jury to sit on any upcoming trial in court. The characteristics of the trial determine the questions asked by counsel and/or the judge, the challenges for cause and the peremptory challenges. The impartiality sought is impartiality toward the main figures and evidence in the case. For instance, an individual who dislikes owners of animal pets may not be a proper juror in a case involving a dog bite but may be a perfectly impartial juror in a case in which pet ownership is not a factor.

In most federal courts, voir dire examinations are conducted by the judge.[2] However, they are handled in many states by lawyers for the defense and for the prosecution.[3] Although there are numerous speculations as to the actual effects of voir dire examinations on jurors, little empirical data exists. One study reported that counsel spent more time in presenting the case during voir dire examinations than in selecting jurors;[4] and that significant time is saved when the court directs questioning (an average of 64 minutes spent by judges versus 111 minutes spent by counsels in voir dire examinations).[5] A second study found no significant difference in time saving, whether the judge or counsel directed the voir dire.[6] This finding is in conflict with the previous study.

## THE DEBATE

The purposes and effects of voir dire have been heatedly debated.[7] Is voir dire as effective as judges have expressed?[8] Is voir dire used as a means to indoctrinate jurors more than as a means of screening out unfavorable jurors?[9] Should voir dire not seek "total neutrality in a particular juror, but random biases in the twelve veniremen we finally choose,"[10] in preference to "the use of scientific knowledge to

1. D. Broeder, *The Functions of the Jury: Facts or Fictions?*, 21 U. Chi. L. Rev. 386 (1954).
2. Report of the Judicial Conference Committee on the Operation of the Jury System, *The Jury System in the Federal Courts*, 26 F.R.D. 409 (1960). In 22 districts judge and counsel conduct voir dire, but in 51 districts only judges conduct voir dire.
3. American Bar Association Project on Minimum Standards for Criminal Justice, *Standards Relating to Trial by Jury* 63 (1968). In 22 states judge and attorney may conduct voir dire, in about 10 states judges alone conduct the voir dire, and in 18 states attorneys only conduct voir dire.
4. Levit, Nelson, Ball & Chernick, *Expediting Voir Dire: An Empirical Study*, 44 S. Cal. L. Rev. 948 (1971).
5. *Id.*
6. Devitt & Blackmar, Federal Jury Practice and Instructions, Civil and Criminal (1970).
7. I. Goldstein, Trial Technique (1935); Brody, *Selecting A Jury—Art or Blind-man's Buff*, 4 Crim. L. Rev. (1957); L. Green, Judge and Jury (1930); Zeisel, Kalven, & Buchholz, Delay in the Court (1959).
8. F. Siebert, *Trial Judges' Opinions on Prejudicial Publicity*, in C. Bush (Ed.), Free Press & Fair Trial, Some Dimensions of the Problem (1970). Siebert found that 44.3 per cent of the judges polled found voir dire to be highly effective and 33.6 per cent felt it was moderately effective.
9. D. Broeder, *Voir Dire Examinations: An Empirical Study*, 38 S. Cal. L. Rev. 503, 528 (1965).
10. Levit, Nelson, Ball & Chernick, *supra* note 4.



EXHIBIT B

better enable attorneys to choose jurors with selected biases"?[11]

Several issues ought to be raised and studied empirically: Do voir dire examinations eliminate prejudiced jurors? Do voir dire examinations constitute an effective safeguard in reducing prejudices of jurors above and beyond that achieved by the judges's closing instructions? Do voir dire examinations sensitize the jurors and/or elicit commitment to examine the evidence in the trial?

The Free Press-Fair Trial Project[12] has studied the effects of prejudicial information and the effects of voir dire examinations on jurors' votes. This is the first large scale, interdisciplinary experimental study of the free press-fair trial problem, conducted with an actual population of jurors, in the courts, with the collaboration of members of the judiciary, the bar, and the news media.[13]

## THE EXPERIMENT

The data collected include jurors' pre-deliberation opinions as to the defendant's guilt or innocence, post-deliberation votes, demographic characteristics of jurors, attitudes of jurors toward their roles as jurors, toward criminals, toward the news media, etc.

The experimental procedure is as follows: A tape based on the transcript of a real trial is produced. The trial is chosen with care as one

11. J. Okun, *Investigation of Jurors by Counsel: Its Impact on the Decisional Process*, 56 Georgetown L. J. 839 (1968). Okun opposes "The use of scientific knowledge to better enable attorneys to choose jurors with selected biases." This is a danger which is limited by the accuracy of predicting an individual's behavior on the basis of statistics which should only apply to the prediction of groups.

12. The Free Press—Fair Trial Project has been conducted at the Bureau of Applied Social Research, Columbia University, by Dr. Alice M. Padawer-Singer, Director of the Project, and Professor Allen Barton, Director of the Bureau of Applied Social Research in cooperation with the Law School and the School of Journalism at Columbia University. Andrew Singer and Rickie Singer have worked as research assistants in the experiments, as producers of the audiotape of the trial and as co-authors of this article and other articles to be published. Our funds come from a variety of sources: the Walter E. Meyer Research Institute of Law, Columbia Broadcasting Company, the New York Times, the Russell Sage Foundation and the National Science Foundation.

13. We were able to conduct this study thanks to the help of Professor Maurice Rosenberg; Justices Bernard S. Meyer and Frank Gulotta, then of Nassau County Supreme Court in Mineola, New York; Justices Arthur Hirsch and Miles MacDonald of Kings County Supreme Court, Brooklyn; Mr. Eugene Gold, Kings County District Attorney; Mr. Caesar Cirigliano, Kings County Legal Aid Society; the lawyers who conducted voir dire; Mr. Kenneth Alvord, now with the National Broadcasting Company, and Mr. Clifton Daniel of the *New York Times*, et al.



*INSTRUCTION: An Ohio judge lectures jurors before turning them over to counsel for voir dire.*







*ALICE M. PADAWER SINGER is a senior research associate of Columbia University's Bureau of Applied Social Research and director of the Jury Project.*

*ANDREW N. SINGER is a second year student at New York University Law School and a research assistant to Jury Project.*

*RICKIE L. J. SINGER is a first year student at Brooklyn Law School and a research assistant to the Jury Project.*

in which there is as nearly as possible an even chance of an acquittal or a verdict of guilty. The case is based mainly on circumstantial evidence; it is the kind of trial which would most likely be affected by prejudicial pre-trial publicity.

Jurors listen to the tape of the trial, deliberate, render verdicts, answer questionnaires, and are interviewed. Their deliberations are taped with their knowledge and consent. In this way, we have tested the effects of (1) exposure to different kinds of pre-trial publicity; (2) selection of jurors with and without voir dire examinations; (3) demographic characteristics and attitudes of jurors. Only the second phase of the experiments is reported here. In that phase, ten juries were randomly selected without voir dire examinations; 13 juries were selected with voir dire examinations by a lawyer from the district attorney's office and a lawyer from the Legal Aid Society.

Before jurors were challenged and selected for a particular jury, they all read newspaper clippings dealing with facts admissible in the trial. Half the juries selected with and half the juries selected without voir dire examinations read newspaper clippings which also included information deemed prejudicial to the defendant, namely an account of his criminal background and an alleged retracted confession. Thus, all the jurors were exposed to newspaper coverage of the alleged crime, but only half were exposed to prejudicial information. Our belief that such information is prejudicial to the defendant has been corroborated by other studies, and in particular by the report that a majority of judges polled in a recent study believe that the publication of the criminal record (86.3 per cent) and the release of a confession by a defendant in advance of a trial (96.4 per cent) are "inappropriate."[14]

## DEMOGRAPHICS

Do voir dire examinations result in juries with special demographic characteristics? A comparison of demographic characteristics of jurors selected with voir dire and jurors selected without voir dire shows few differences. There is a preponderance of male jurors in the two groups, since women are still exempt from jury duty if they so wish. Voir dire juries were 86.3 per cent male; 89.1 per cent were male in no voir dire juries.

There were fewer Catholics in voir dire juries (43.5 per cent versus 52.8 per cent) and a smaller proportion of managerial, executive and professional positions, (8.7 per cent as compared to 15.0 per cent). Similarly, voir dire juries contain a smaller proportion of highest paid and/or most prestigious job categories, (1.6 per cent versus 13.5 per cent). Fewer voir dire jurors, (9.3 per cent) have a college degree as compared to 16.2 per cent of no voir dire jurors. This accounts for the smaller proportion of voir dire jurors in the most prestigious occupations and the larger number of voir dire jurors in the second highest status range (artist, teacher, lithographer, etc.).

Again, in voir dire juries as compared to no voir dire juries, there are few differences in the proportion of republicans (20.9 per cent ver-

14. Siebert, *supra* note 8. Two studies have found that knowledge of a criminal record and confession is prejudicial to the defendant: Tans and Chaffee, *Pretrial Publicity and Juror Prejudice*, 43 JOURNALISM QUARTERLY 647-54 (1966).

sus 19.3 per cent), democrats (58.8 per cent versus 52.1 per cent), and conservatives (2.6 versus 0.8 per cent). There is a smaller percentage of non-partisan voters in voir dire juries, (11.8 per cent as compared to 21.0 per cent).

## EXPOSURE TO PREJUDICE

What are the effects of reading about the criminal background of and an alleged retracted confession by the defendant? We hypothesized that more jurors find the defendant guilty when they have been pre-exposed to prejudicial information. The results of our experiments show the following:

1. When jurors are selected randomly without voir dire examinations, 78.3 per cent of "exposed" jurors as compared to 11.6 per cent of "not exposed" jurors vote for guilty.
2. When jurors are selected with voir dire examinations, 60 per cent of exposed jurors as compared to 50 per cent of "not exposed" jurors vote for guilty.[15] The differences in voting for guilty are in the expected direction and support our hypothesis.

The effects of voir dire selection were compared to the effects of random selection of jurors without voir dire (1) when jurors are exposed to prejudicial information, and (2) when they are not exposed to such information. The main hypothesis is: Voir dire examinations should reduce prejudices introduced by exposure to prejudicial information. This should be evidenced by a smaller number of "exposed" jurors selected by voir dire examinations who find the defendant guilty as compared to the number of "exposed" randomly selected jurors who find the defendant guilty.

We found that indeed when they have been selected by voir dire examinations, a smaller number of "exposed" jurors vote for guilty: an average of 7.2 per panel or 60 per cent as compared to the mean number of 9.4 or 78.3 per cent of "exposed" jurors who have been randomly selected without voir dire. This difference is in the expected direction since voir dire proceedings are presumed to eliminate jurors who would be influenced by prejudicial information or to sensitize jurors to examine the evidence and not to be influenced by extraneous prejudicial information. Voir dire proceedings carried out by two lawyers, one for the prosecution and one for the defense, seem to ensure the selection of the "best" possible jurors, i.e. the most impartial jurors, jurors who will examine all sides of a trial.

Some believe that voir dire may make jurors more willing to side with the defense than with the prosecution. If this were true, then the following data should have been obtained: Less "not exposed" jurors chosen by voir dire would find the defendant guilty than "not exposed" jurors randomly chosen *without* voir dire.

The results do not bear this out. More "not exposed" jurors, selected by voir dire, (6.0 or 50 per cent) found the defendant guilty as compared to the mean number of "not exposed" jurors *not* chosen with voir dire, (an average of 1.4 or 11.7 per cent) who found the defendant guilty.

*Voir dire tends to reduce the effects of prejudicial information . . .*

The data collected include jurors' predeliberation opinion on a one-page anonymous voir dire procedure reduces the number of "exposed" jurors voting for guilty. When jurors have not been exposed to prejudicial information, voir dire does not automatically reduce the number of jurors voting for guilty, as witnessed by the comparisons between the votes of "not exposed" juries randomly selected without voir dire. Voir dire seems to reduce the effects of prejudicial information and to sensitize jurors to examine all sets of facts and arguments in a trial.

The data collected include jurors' predeliberation opinion on a one-page anonymous

15. These results are based on juries from Brooklyn, in Kings County, Supreme Court of the State of New York. Five juries were selected with voir dire and exposed to prejudicial information, eight juries were selected with voir dire and not exposed to prejudicial information, five juries were selected without voir dire and "exposed" and five juries were selected without voir dire and not exposed to prejudicial information.

Voir dire induces a commitment to the law and to the juror's role

questionnaire. When the pre- and post-deliberation votes of individual jurors selected with and without voir dire examinations are compared,[16] the results show that

1. When jurors selected by voir dire are exposed to prejudicial information, 5.6 per cent shift away from guilty, and when not exposed to prejudicial information, 6.8 per cent shift away from guilty.

2. Jurors selected without voir dire display large shifts of opinion during deliberations: When exposed to prejudicial information, 35 per cent shift toward not guilty. We notice, therefore, a substantial shift in the no voir dire groups during deliberations, perhaps because, in the absence of voir dire examinations, jurors lack the full picture of the trial which voir dire examinations by two lawyers provide. In the experiments reported above, all jurors had heard the judges' charges at the end of the trial. Yet, they were more often willing to convict when exposed to extraneous prejudicial information. Judges' instructions alone are not sufficient to counteract prejudicial information. Voir dire selection constitutes an additional safeguard.

Voir dire by counsel appears to have the effect of counteracting, to some degree, the influence of extraneous matter such as, in this case, the prejudicial newspaper clippings. Jurors who are not selected by voir dire are more likely to shift to a guilty verdict as a result of exposure to prejudicial information, and to not guilty when such information is lacking. Voir dire may tend to eliminate jurors who are potentially easily swayed or pressured in a group situation or to sensitize jurors against group pressure. The tangible presentation by two lawyers attests to the importance of the trial and may make jurors less easily persuasible. This may account for the large swing in votes by jurors selected without voir dire during deliberations.

## ATTITUDES

Attitude statements were presented to jurors with the instructions to indicate whether they agreed strongly, just agreed with, were undecided about, disagreed, or disagreed strongly

16. These results were tabulated by Mr. Herman Kane.

with the various statements. We found that the attitudes of jurors selected with and jurors selected without voir dire examinations are similar.

There were some differences, however. In regard to attitudes toward crime, we find that jurors selected with voir dire (1) are less inclined to believe in capital punishment; (2) are more in favor of protecting the rights of the accused; (3) are more in favor of considering the past history of an individual, such as mental illness, poverty, unhappiness; (4) believe more often that crimes have been committed all through the history of mankind, that things are about the same now as they have always been; (5) believe that there cannot be law and order unless there is justice for minorities.

In regard to attitudes toward their roles as jurors, jurors selected with voir dire display a greater tendency to follow the letter of the law (1) whether the law is fair or not; (2) whether it means releasing a defendant whom one knows is guilty because of insufficient evidence; (3) whether it means trying to ignore testimony stricken from the record but which is heard in court. Voir dire seems to make jurors more aware of the importance of legal procedures and of admissible evidence.

## IN SUMMARY

The study of the jury system instills great respect for jurors and illustrates the fundamental importance of the jury.

We have been studying ways to further reduce jurors' biases, biases which come from various sources. This involves (1) strengthening the effects of judges' instructions and of voir dire examinations by lawyers, and (2) informing jurors as to the meaning of various legal procedures in a manner which would eliminate difficulties jurors experience during a trial and subsequent deliberations.

The data from the Free Press-Fair Trial Project show that voir dire examinations by counsel diminish the effects of prejudicial information by reducing the number of jurors voting for guilty when they have been exposed to such information; they do not, as some might believe, result generally in fewer "guilty" votes when they have not been "exposed" to such information. Voir dire induces a commitment to the law and to the jurors' role.

The greatest effectiveness of voir dire examinations may not be in selecting jurors who would form a fair jury not only in attempting to eliminate prejudiced jurors. Selection of *individuals* on the basis of principles of social science and statistics which apply to *groups* cannot predict the behavior of a particular juror with any degree of accuracy. Selection of jurors is not the only function of voir dire examinations. Our data suggest that voir dire examinations sensitize jurors to the importance of the law and of examining the evidence. Jurors selected with voir dire make a public commitment, which may explain the fact that they do not display great shifts of votes during deliberations.

Voir dire examinations are not conducted as an abstraction; they are closely tied to the evidence and aspects of the case. For instance, a challenge may be made if one counsel believes that a juror, because of his life circumstances, would identify too closely with or would dislike the defendant, the witnesses or other figures in the trial. Voir dire by two lawyers as opposed to voir dire by a judge will be more effective because counsel have extensively reviewed and researched the facts of the case for a period of time, whereas a judge has to give his attention to various trials during that period of time. The concrete representation by two lawyers that there are various aspects in the trial gives jurors an idea of the scope of the trial, gives them "anchors,"[17] and sensitizes them to examine all that is presented.

Voir dire examination by two lawyers constitutes an essential safeguard for the administration of justice. It does this through the multiple functions of screening out some prejudiced jurors, reducing prejudices introduced by extraneous information such as pre-trial publicity, committing jurors to the importance and meaning of legal procedures, and sensitizing jurors to various aspects of the case. □

17. Sherif discussed the importance of anchor effects on judgments of social issues. M. SHERIF, SOCIAL JUDGMENT (1961).